97 F.Supp.2d 224 (2000)
N.S., By and Through her parents and next friends, P.S. and P.S., Plaintiff,
v.
STRATFORD BOARD OF EDUCATION, Defendant.
No. 3:98CV1864 SRU.
United States District Court, D. Connecticut.
January 28, 2000.
*225 *226 David Shaw, Hartford, CT, for plaintiff.
Richard Buturla, Marsha Moses, Berchem, Moses & Devlin, P.C., Milford, CT, for defendant.

RULING ON PENDING OBJECTION AND MOTION
UNDERHILL, District Judge.
This is an action seeking attorneys' fees and costs incurred during administrative proceedings under the Individuals With Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1415, et seq. Those proceedings were held at the request of the plaintiff parents to challenge the special education program offered to their child by the defendant, Stratford Board of Education (the "Board"). After 26 days of hearings, the hearing officer issued a final order. Plaintiff then brought this action, claiming to be a prevailing party entitled to an award of fees and costs under the IDEA.
The matter was referred to Magistrate Judge Donna F. Martinez for rulings on plaintiff's Motion For Summary Judgment (doc. # 17), Supplementary Motion For Costs And Fees Subsequent To January 22, 1999 And For Revised Costs (doc. # 31), and Supplementary Motion For Costs And Fees Subsequent To June 10, 1999 Supplementary Motion (doc. # 38). On September 30, 1999, Judge Martinez issued a Recommended Ruling On Pending Motions ("Recommended Ruling") (doc. # 43) in which she recommended granting in part plaintiff's motion for summary judgment and supplementary motions for costs and fees.
Presently pending are Defendant's Objection To Magistrate's Recommended Ruling On Pending Motions ("Objection") (doc. # 47) and plaintiff's Supplementary Motion For Costs And Fees Subsequent To September 30, 1999 Recommended Ruling (doc. # 50). For the reasons given below, the Objection is overruled, the Recommended Ruling is adopted and accepted, and the pending supplementary motion for costs and fees is granted.

Objection to Recommended Ruling
The Board timely filed its Objection to the Recommended Ruling. When an objection to a Magistrate Judge's recommended ruling on a dispositive motion has been filed by any party, the Court must "make a de novo determination of those portions of the proposed decision to which objection is made, and may accept, reject, or modify the recommended ruling in whole or in part." Rule 2(b), Local Rules for United States Magistrate Judges; see Fed.R.Civ.P. 72; 28 U.S.C. § 636(b)(1)(B).
The Board raised five "central" objections to the Recommended Ruling. These can be divided into objections based upon the claimed existence of a genuine issue of material fact and an objection based upon a perceived misapplication of the standard for awarding attorneys' fees to prevailing parties.

A. Undisputed Material Facts
Four of the Board's five central objections turn on a claim that facts relied upon by Judge Martinez in the Recommended Ruling were disputed.[1] Those objections lack merit.
*227 For purposes of the summary judgment motion, the facts relied upon by Judge Martinez were undisputed because the Board failed to file a statement of disputed material facts, as required by the Local Rules.[2] Under Rule 9(c) of the Local Rules of Civil Procedure, a party filing a motion for summary judgment must file a Local Rule 9(c)1 Statement, setting forth "in separately numbered paragraphs a concise statement of each material fact as to which the moving party contends there is no genuine issue to be tried." Significantly, the Rule also provides that: "All material facts set forth in said statement will be deemed admitted unless controverted by the statement required to be served by the opposing party in accordance with Rule 9(c)2." (Emphasis supplied.) Rule 9(c)2 provides, in relevant part, that the papers opposing a motion for summary judgment must include a statement "whether each of the facts asserted by the moving party [in its Rule 9(c)1 Statement] is admitted or denied. [And] ... must also include in a separate section a list of each issue of material fact as to which it is contended there is a genuine issue to be tried." L.R.Civ.P. 9(c)2.
Although Judge Martinez did not expressly state that she relied upon the plaintiff's uncontroverted Rule 9(c)1 statement as setting forth the undisputed facts, a comparison of the Recommended Ruling with the Rule 9(c)1 statement demonstrates that she did so. That reliance was appropriate. See Dusanenko v. Maloney, 726 F.2d 82, 84 (2d Cir.1984) (facts set forth in statement of undisputed facts were properly deemed admitted given opposing party's failure to file local rule statement of disputed material facts; entry of summary judgment appropriate), Booze v. Shawmut Bank, Connecticut, 62 F.Supp.2d 593, 595 (D.Conn.1999) (all facts in Rule 9(c)1 statement deemed admitted given failure to file timely Rule 9(c)2 statement). One important purpose of Local Rule 9(c) is to direct the court to the material facts that the movant claims are undisputed and that the party opposing the motion claims are disputed. Otherwise the court is left to dig through a voluminous record, searching for material issues of fact without the aid of the parties. Although the Board has attempted to identify material issues of fact in its Objection, that effort is unavailing.
The Board repeatedly complains that Judge Martinez "found" certain facts "without citation" to the record. E.g., Objection at 7, 9, 10, 13-14. In each instance, the undisputed fact relied upon by Judge Martinez is set forth either in plaintiff's Rule 9(c)1 Statement, see Rule 9(c)1 Statement ¶¶ 37 ("the parents proposed that a mutually acceptable independent educational consultant be retained"), 43 ("the Board was well aware of [parents'] long-repeated desire for an independent consultant"), 64 ("The hearing officer found that the Board has not offered an appropriate program and placement."); or in the hearing officer's report, see Final Decision and *228 Order at 16, ¶¶ 9 & 10 ("Therefore, the purported IEP also fails as it has no basis in any recent evaluation of N.'s areas of need." "It is fairly clear that certain elements of the purported IEP were planned with little thought to meeting N.'s unique needs."); 19, ¶ 15 ("Having found that an appropriate program and placement has not been offered, what should N.'s program look like? The simple answer is that we do not know what the final program will look like because the information needed to make informed decisions is not yet available. So far, programming for N. has been reactivenot proactive."); 20, ¶ 1 ("The Board has not offered N. an appropriate program and placement."). Any mistakes made by Judge Martinez were immaterial.[3]
The Board attempts to create material issues of fact by parsing out differences between the affidavit submitted by Dr. Vespe for the Board and the affidavit submitted by N.'s father. That effort fails.
The Board focuses here on a perceived dispute over the purpose of the due process hearing, an important factor in deciding whether the plaintiff is a prevailing party. The Board cites to Dr. Vespe's affidavit as establishing that "the parents' primary objective was to have N. attend the Stratford Academy," a local school attended by her siblings. Objection at 5 (emphasis supplied). Although Dr. Vespe's affidavit supports the proposition that attending the same school as her siblings was one of the objectives of the plaintiff, that proposition was expressly recognized by both the hearing officer and Judge Martinez, see Final Decision and Order at 2; Recommended Ruling at 10, and therefore is not a genuine issue of fact. Moreover, even assuming Dr. Vespe's competence to opine on the plaintiff's intentions, his affidavit cannot be fairly read as supporting the proposition that the plaintiff's primary objective was to secure a place at Stratford Academy. See Vespe Affidavit ¶¶ 6-12. Therefore, even without reliance on the absence of a Rule 9(c)2 statement, the affidavit of Dr. Vespe fails to create a genuine issue of material fact.[4] Judge Martinez acknowledged that the plaintiff both raised and lost the issue of attending the same school as her siblings. The Recommended Ruling is wholly consistent with the Vespe affidavit on this issue.
The Board also seeks to limit the issues raised by the parents to those expressly stated in their request for a due process hearing. See Objection at 10 ("[T]he hearing officer was never asked to make any findings of fact or orders with respect to the program or placement.... The hearing officer was asked only to decide whether the IEP ... was appropriate."). As the final order itself makes clear, however, the hearing officer understood that more issues *229 than those expressly included in the parents' request for hearing were to be decided. See Final Decision and Order at 2 ("ISSUES: 1. Has the Board offered N. an appropriate program and placement? a. Does the IEP comport with all statutory requirements?"). The Board's contention that the hearing officer did not conclude "that the program or placement offered by the Board was inadequate," Objection at 10-11, is directly contradicted by point one of the hearing officer's final decision and order: "1. The Board has not offered N. an appropriate program and placement."
The Board's effort to challenge the Recommended Ruling on the basis that Judge Martinez made findings on material issues of disputed fact fails.

B. The Legal Standard Governing Fee Applications
The Board also challenges the legal standard employed by Judge Martinez when ruling on the merits of the fee applications. In essence, the Board argues that Judge Martinez erred by considering success on issues not formally raised in the written request for a due process hearing when deciding whether the plaintiff was a prevailing party. Judge Martinez did rely on the outcome of such issues when deciding the prevailing party question.
The court concludes that the parents are prevailing parties entitled to recover attorneys' fees. Although not every item of relief is identical to the relief demanded in their request for a hearing, the parents did achieve success on several significant issuesthey blocked the Board's plan to have N placed in the segregated IR program; they succeeded in having the IEP declared deficient, thereby enabling them to engage in a new, dynamic process of designing a specialized education plan for their daughter; they succeeded insofar as the PPT was not required to consider inclusion as a viable alternative to the segregated IR program previously advocated; they succeeded in having an independent consultant and case manager appointed; and finally, they succeeded in having mandated weekly meetings.
Recommended Ruling at 24-25.
Judge Martinez appropriately considered success on these issues, which were litigated by the parties even though they were not formally raised in the due process hearing request. Adopting the Board's formalistic approach would render the prevailing party question dependent on the technicalities of pleading. The Second Circuit has rejected that approach.
Denying attorney fees under these circumstances would impose excessively onerous burdens on litigants seeking fee awards, so that virtually anything less than perfect congruence between the relief requested and the relief obtained would defeat a fee award. Such an approach clearly contradicts the "generous formulation" of the prevailing party test that the Supreme Court set forth in Texas State Teachers Association. See 489 U.S. at 792, 109 S.Ct. 1486, 103 L.Ed.2d 866.
G.M. v. New Britain Board of Education, 173 F.3d 77, 83 (2d Cir.1999).
Thus, although the relief formally requested by plaintiff is a starting point for determining prevailing party status, it is not the ending point for that analysis.
In applying the prevailing party standard, it is helpful to identify the relief sought by the plaintiff and compare it with the relief obtained as a result of the suit. [citations omitted] "A plaintiff may be considered a prevailing party even though the relief ultimately obtained is not identical to the relief demanded in the complaint, provided the relief obtained is of the same general type." Koster v. Perales, 903 F.2d 131, 134-35 (2d Cir.1990) [citation omitted].
Christopher P. v. Marcus, 915 F.2d 794, 804-05 (2d Cir.1990) (emphasis supplied) (cited in G.M. v. New Britain Board of Education, 173 F.3d 77, 81 (2d Cir.1999)).
*230 The correct comparison is between the relief sought, i.e., the issues actually litigated, and the results achieved. Litigation under the IDEA is necessarily fluid. In this case, the Board does not suggest that the 26 days of hearings were taken up solely with the issues formally raised in the request for a due process hearing. Instead, the hearing officer understood that the relief sought by the parents was broader than that set forth in their hearing request, and the hearing officer awarded relief on those broader claims. See Final Decision and Order at 2 (issues raised), 20 (relief awarded). Because there was a causal connection between the relief obtained and the litigation before the hearing officer, Judge Martinez correctly concluded that the plaintiff was a prevailing party for purposes of a fee award.

C. The Amount of Fees and Costs Awarded
The Board argues, in the alternative, that, even if plaintiff is entitled to an award of fees and costs under the IDEA, the amount awarded should reflect a reduction from the lodestar rate of more than fifteen percent. The greater reduction is required, according to the Board, to reflect the minimal degree of success achieved by plaintiff. The Board has identified specific time entries for plaintiff's counsel that it contends relate to issues on which the plaintiff did not prevail, and suggests that these time entries and related costs should be disallowed. The Board also argues that, at a minimum, the fifteen percent reduction in the award used by Judge Martinez for the principal fees and costs application should be applied to the plaintiff's supplementary fee applications, too. Although the Board's arguments merit close attention, ultimately none is persuasive.
Reducing a fee award to reflect plaintiff's degree of success is an imprecise process that invariably results in figures that can be picked apart by either side. Following a review of the record, however, I am satisfied for a variety of reasons that the reduction of fifteen percent used by Judge Martinez fairly reflects the degree of plaintiff's success in this case.
First, the fifteen percent reduction results in a number quite close to that generated by a modified elimination of the specific time entries identified by the Board. The initial fees request sought: $113,325 for Attorney Shaw's time (453.3 hours at $250 per hour),[5] $3,210 for Attorney Roznoy's time (21.4 hours at $150 per hour), and $6,240 for Attorney Feinstein's time (32 hours at $195 per hour), for a total of *231 $122,775 plus costs. Applying a straight fifteen percent reduction to these numbers generates a total of $104,358. Reducing the fee request by most of the specific items identified by the Board as relating to issues the plaintiff lost[6] results in a fee award of just over $105,000[7]a slightly higher amount than produced by the fifteen percent reduction. One could reasonably factor in the requested reduction in the costs sought and could factor in some hearing preparation and attendance time to further reduce the award and to bring it below the fifteen percent approach, but this would be unduly harsh in the present case. The plaintiff's counsel began recording time on this case in June 1997, more than two and one-half years ago, and incurred the vast bulk of their fees in 1997 and 1998. Because no adjustment will be made for the lost time value of money, any further reductions would penalize the plaintiff for the fact that it has taken the court so long to rule on the fee application.
Nor should the fifteen percent reduction apply to the various supplementary fee applications. The time reflected in those applications relates entirely to activities associated with the present motion for summary judgment, on which plaintiff has been nearly entirely successful. Although it is possible to quibble over a few of the time entries submitted with both the initial fee application and the supplementary applications, the time entries overall reflect a very efficient handling of both the lengthy administrative hearing and the substantial briefing in this case.
Accordingly, the amount of the award of fees and costs set by Judge Martinez in the Recommended Ruling is adopted and approved.

D. Summary
Judge Martinez properly relied on the undisputed facts set forth in plaintiff Rule 9(c)1 statement and in the hearing officer's final decision when she issued her Recommended Ruling in this case. The Recommended Ruling properly concluded that plaintiff is a prevailing party for purposes of the IDEA. The amount of the award of fees and costs established by Judge Martinez fairly represents the degree of success by the plaintiff in the administrative hearing.

Supplementary Motion for Costs and Fees
Also pending is plaintiff's Supplementary Motion For Costs And Fees Subsequent To September 30, 1999 Recommended Ruling (Doc. # 50). That motions seeks $4,945.00 in attorneys' fees relating primarily to plaintiff's reply brief, filed in response to the Board's Objection to the Recommended Ruling. The Board raises three objections to this latest motion for fees: first, the Board incorporates its previous argument that plaintiff is not a prevailing party; second, the Board argues that any fees awarded in connection with the present motion should be reduced to *232 reflect plaintiff's degree of success on the merits; and, third, the Board attacks the present application as excessive.
The first two arguments have been addressed above. For the reasons discussed above, plaintiff is a prevailing party and this last supplementary motion should not be subject to an across-the-board reduction. Nor is the application excessive. Although the application requests reimbursement for more than 24 hours of additional time spent on this matter, that total reflects the fact that plaintiff submitted a 23-page reply brief in response to the Board's Objection. Plaintiff's reply brief comprehensively addressed a number of factual and legal issues. Accordingly, the court finds that the latest application is reasonable and awards plaintiff the requested $4,945.00 in fees.

Conclusion
The Recommended Ruling (doc. # 43) is ADOPTED AND ACCEPTED by the court, with only the minor revisions noted in footnote 2, above. Accordingly, plaintiff's motion for summary judgment and first two supplementary motions for attorneys' fees and costs (doc. 17, 31, and 38) are GRANTED in part. Plaintiff's latest supplementary motion for attorneys' fees and costs (doc. # 50) is GRANTED. Plaintiff is awarded the sum of $127,042.88 in attorneys' fees and costs (the $122,097.88 from the Recommended Ruling plus the $4,945.00 from plaintiff's Supplementary Motion For Costs And Fees Subsequent To September 30, 1999).
The clerk shall enter judgment and close this file.
It is so ordered.

RECOMMENDED RULING ON PENDING MOTIONS
MARTINEZ, United States Magistrate Judge.
This is an action for reimbursement of attorneys' fees and costs incurred during administrative proceedings under the Individuals With Disabilities Education Act ("IDEA"), 20 U.S.C. § 1415 et seq. The plaintiff parents initiated the administrative hearing to challenge the special education program offered to their child by the defendant Stratford Board of Education. After the hearing officer issued a final order, the plaintiff parents filed this action seeking attorneys' fees and costs.
Currently pending before the court is the plaintiffs' Motion for Summary Judgment (doc. # 17), plaintiffs' Supplementary Motion for Costs and Fees Subsequent to January 22, 1999 and for Revised Costs (doc. # 31) and plaintiffs' Supplementary Motion for Costs and Fees Subsequent to June 10, 1999 Supplementary Motion (doc. # 38).
For the reasons stated below, the court recommends that the plaintiffs' motion for summary judgment (doc. # 17) and supplemental motions be GRANTED in part.

I. UNDISPUTED FACTS

Based upon the parties' submissions, the court finds the following facts to be undisputed for purposes of the plaintiffs' motions for summary judgment and for supplemental attorneys' fees.
N.S. ("N") was born on August 26, 1989 and is now ten years old. During the first nine months of her life, her parents noted differences between N and her older siblings, including indifference to others and general cognitive delays. Around the same time, she was tentatively diagnosed with autism and/or pervasive developmental disorder.[1]
When N turned three years old, she began receiving services from the defendant Stratford Board of Education ("Board"). During her preschool years, N was referred by the Board to St. Vincent's Special Needs Center ("Special Needs Center"). The Special Needs Center provided *233 N with occupational, physical and speech therapy.
In 1995, when N was six years old and about to begin kindergarten, her parents began to communicate with the Board about N's educational opportunities in the public schools. In order to design an appropriate education plan for N, the Board retained Ami Klin, Ph.D., an Associate Professor in Child Psychology at the Yale Child Study Center. Dr. Klin observed and evaluated N. In his report to the Board, Dr. Klin said that N's speech, language and communication skills had been overestimated and that she needed an independent speech and language evaluation. He opined further that N had significant cognitive delays which were not being recognized. He recommended that N be placed in a special education plan with intensive language instruction. Dr. Klin did not believe a mainstream[2] education in a regular classroom setting was an appropriate placement for N and he believed that N's parents and educators had under-estimated her need for special education.
On September 8, 1995, N's Planning and Placement Team ("PPT")[3] met to discuss her situation and to review Dr. Klin's report. At the meeting, Kathleen O'Neill, N's speech and language therapist from the Special Needs Center, stated that N had enjoyed some degree of success as a result of peer modeling, sensory integration activities, and supplemental instruction.
After the PPT meeting, the Board proposed that N attend ACES, a segregated special education program in West Haven, for the 1995-1996 school year. N's parents objected to the Board's proposal and requested that she be placed closer to home in an inclusive program with supplemental aids and services. Although the Board maintained its commitment to the segregated ACES program, it indicated that it would consider another option placing N at the Jennings School in nearby Fairfield, Connecticut.
N and her parents visited Jennings School on October 10, 1995. Afterwards, Linda J. Stohmeyer, the Special Education Coordinator for the Fairfield Public Schools, wrote to the Board and recommended that N be placed in a mainstream kindergarten classroom for opening exercises, lunch and recess. She suggested that other mainstream activities, such as gym, play and story time, be added to N's schedule as appropriate. Ms. Stohmeyer also recommended that N be provided with a paraprofessional to work solely with N.
On October 27, 1995, the PPT agreed to the plan proposed by Ms. Stohmeyer. An Individual Education Program ("IEP") was drafted in accordance with Ms. Stohmeyer's plan.[4] N began to attend the Jennings School.
*234 The PPT held meetings on January 9, January 23 and June 17, 1996 to discuss N's progress. Jennings School staff reported that although N displayed progress in her speech and language skills, her behavior had regressed. N had started expressing her frustrations by kicking, hitting and spitting. N also had difficulty making the transition between activities. Her academic performance differed from day to day.
A new IEP was drafted at the June 17, 1996 meeting. The new IEP provided that for the next school year N would continue at Jennings School. She would participate in an extended school day and submit to a behavioral evaluation.
Dr. Christine Peck conducted the behavioral evaluation. In a report dated August 7, 1996, she wrote that N's challenging and dangerous behaviors were difficult to manage. She thought that many of the problems resulted from inconsistent behavior management techniques at home and school. Dr. Peck concluded that efforts to address N's behavior should be coordinated between home and school and the behavior management plan should be applied in a uniform and consistent manner. To accomplish this, Dr. Peck recommended a two-part family intervention plan: first, employ an aide in the home to work on N's concentration, independence and communication skills on a daily basis for four to six weeks; and second, phase out the aide's involvement as N's parents grew to accept greater responsibility for managing her behavior. On September 30, 1996 and November 25, 1996, the PPT reviewed and adopted Dr. Peck's report.
During the fall of the 1996-1997 school year, N developed a good rapport with her first grade special education teacher. With the assistance of her teacher, N was gradually integrated into the regular first grade classroom for up to 2 hours per day.
At a January 6, 1997 PPT meeting, N's parents expressed concern that N was not meaningfully involved with non-disabled students. They asked that a timetable be developed for N's inclusion in regular classes. They also asked that weekly PPT meetings be held to improve communication between home and school.
In late January, N regressed. Her special education teacher left on maternity leave earlier than expected and N began spitting, had toileting accidents and refused to enter the regular classroom. The PPT discussed these problems at their April 4, 1997 meeting. At the meeting was a State Department of Mental Retardation behavioral specialist, Sandi LiBrandi, who had observed N in school as far back as November 1996. The PPT recommended that Ms. LiBrandi work with the Jennings School to develop and implement a behavioral plan and an "inclusion matrix." The inclusion matrix was designed to allow N to be integrated into a regular classroom. It separated N's school day into segments, listed her activities in conjunction with IEP goals and gave staff assignments. Although N's parents were pleased with Ms. LiBrandi's recommendations, the inclusion matrix was never completed.
During April or May 1997, the Board retained Kathleen Whitbread, an educational consultant. After evaluating N, Ms. Whitbread opined that N had learned *235 to manipulate her teachers and parents. She recommended that N be made a full member of a regular education classroom. In order to accomplish this goal, she suggested that the Board obtain the assistance of an inclusion facilitator. She further suggested that N's participation in a mainstream educational setting not be contingent on good behavior, that N be required to follow the same routine as her classmates and that N participate in inclusive recreational activities with her nondisabled peers. She agreed with N's parents that weekly PPT meetings should be held.
On April 28, 1997, N's parents met with Dr. Angelo Vespe, the Board's Director of Special Services, to discuss the 1997-1998 school year. N's parents continued to ask that N be placed in an inclusive educational setting supplemented by whatever aids and services were necessary to meet her special needs. N's parents were aware that N would have to be taken out of the regular classroom for periods of intensive education. They suggested that the Board place N at Stratford Academy, a magnet school close to home that N's four siblings attended.
There was another PPT meeting on June 11, 1997 to discuss the upcoming school year. The meeting, which continued until June 24, became acrimonious. The Board's position differed from that of N's parents. The Board wanted to place N in a special education classroom in the Intensive Resource ("IR") program at the Whitney School. The Whitney School has been designated by the Board to serve those children with the most serious and varied needs. The Whitney School's IR program consists of several self-contained classrooms, each with 4 to 5 five disabled children having intense special education needs. The IR program is a segregated program, and as such, offered N limited opportunities for contact with non-disabled children. Occasionally, the Board said, N could be taken out of her special classes and placed in regular classes.
N's parents were dissatisfied with the proposed IR program. They explained to the PPT that they wanted N to grow up to be as independent as possible and that to achieve this goal she should be integrated with her peers with proper support services. N's parents said that they were displeased with the Jennings School, particularly because N spent 95% of her day in a classroom separate from her nondisabled peers. N's parents wanted to follow Ms. Whitbread's recommendations; specifically, they did not want N's placement in an inclusive setting to be contingent upon her good behavior. They again requested that N be placed in a regular class at Stratford Academy with appropriate support services. To determine what additional services might be required for N in a regular classroom, the parents asked the Board to retain a mutually acceptable independent consultant who believed in inclusion. Their first choice was Ms. Whitbread.[5]
On June 24, 1997, there was another PPT meeting. Dr. Vespe, on behalf of the Board, told N's parents that the Whitney IR program was the appropriate placement for N and that full inclusion was not appropriate. He also stated that because the Board had its own inclusion consultant, Dr. Kurker-Stewart, there was no need to retain an outside consultant. Further, he said that N would be transported to Whitney on a small van and later would make the transition to a large bus.
Unhappy with the outcome of the meeting, the parents filed a request on July 3, 1997 for a full administrative, or "due process,"[6] hearing. N's parents filed a prehearing *236 conference statement of issues. Their issues were:
1) Whether N should attend regular education classes with supplemental aids and services;
2) Whether N should attend her neighborhood magnet school with her brothers and sisters;
3) Whether N should ride the regular bus.
See Plaintiffs' Rule 9 Statement of Material Facts, doc. # 18, ¶ 42.
The parents did not include in their formal request all of their concerns. They did not include their request to have N independently evaluated, to retain a mutually agreed upon independent[7] inclusion consultant, to have a case manager assigned to help with N's eventual inclusion into a regular education setting nor did they include their desire to have weekly PPT meetings. The Board, however, knew that N's parents wanted these issues addressed.
The due process hearing began on August 15, 1997. The hearing officer defined the issues as follows:
1. Has the Board offered N. an appropriate program and placement?
a. Does the IEP comport with all statutory requirements?
b. Have the requirements of 20 U.S.C. § 1412(a)(5)(a) been met?
2. Is the Board required to provide a program for N. in the same school attended by her four siblings?
Doc. # 19, Exh. 1, p. 2.
The hearing lasted 26 days and was completed on July 29, 1998. During the pendency of the hearing, that is, during the 1997-98 school year, N remained at the Jennings School.
In preparation for the due process hearing, the Board had retained Dr. Kurker-Stewart and Dr. Klin[8] to assess N's cognitive and academic abilities. N's parents retained Dr. Mara Sapon-Shevin.
Dr. Kurker-Stewart, the Board's inclusion consultant, testified at the hearing. She proposed that N be placed in a regular classroom, but with scheduled focused instruction outside of the regular class. Dr. Kurker-Stewart observed that N's behavior was not being managed consistently and that N had learned to manipulate. She said that N's participation in a regular education setting should not be contingent upon good behavior. Dr. Kurker-Stewart thought that N's IEP was incomplete and that it lacked sufficient detail as well as adequate standards of measurement. Dr. Kurker-Stewart proposed a transition plan to ease N back into a school within the Stratford public school system. The plan called for a team, led by a case manager, to create a detailed plan that outlined N's daily and weekly school schedules.
*237 Dr. Klin also testified on behalf of the Board. He declared that N's cognitive strengths and weaknesses warranted a full evaluation and that her lack of language skills made difficult an accurate assessment of her abilities. Dr. Klin proposed that N be placed in a highly individualized, intensive, structured program with individual and group instruction. He recommended that N spend a considerable amount of time in an inclusive setting, but noted that she required substantial supports. He testified that the IR program, the segregated program previously advocated by the Board, was somewhat effective for N's progress but that the program required more planning.
Dr. Sapon-Shevin, the consultant retained by N's parents, testified that the IEP was lacking. She believed that the objectives in the IEP had no articulated basis, that the IEP was based on insufficient evaluations and that it was vague. She recommended that N be placed in a stable, regular classroom with few distractions.
One month after the hearing adjourned, the hearing officer rendered her opinion. She found that the parents and the Board agreed that N should be in a regular classroom setting for at least part of the school day. The Board, however, maintained that N should at least begin the then-current school year in the more restrictive IR program. The parents, on the other hand, advocated a full-time regular education with specialized instruction in a special education class as needed.
After consideration of testimony and the various reports and documents before her, the hearing officer concluded that:
 the Board did not offer N an appropriate program or placement;
 the Board was not required to place N at the Stratford Academy, the magnet school that N's siblings attended;
 N would have a consultant and case manager, Linda Grimm,[9] who was dedicated to N's inclusion in a regular classroom;
 comprehensive cognitive and speech and language evaluations, as well as a behavioral evaluation were to be performed;
 the inclusion matrix was to be completed;
 the PPT was required to consider Dr. Kurker-Stewart's transition plan;
 weekly team meetings would be held; and
 N would be placed in a regular classroom with a paraprofessional and Ms. Grimm at least until such time as the new IEP was completed.
See Doc. # 9, Exh. 1, pp. 20-21.
The hearing officer further concluded that an appropriate IEP could not be completed until N was further evaluated and the planning process was completed. The hearing officer observed, however, that the program in place at the time of the hearing was ineffective. She concluded that "so far, programming for N. has been reactivenot proactive. Consultants have been brought in, usually too late, to deal with crisis situations, and their suggestions have not been fully implemented." Id. at 19. She noted that the issue of transportation was resolved during oral argument when the Board declared that N would not be required to ride a van to school, but could take the large bus with non-disabled students.
After the hearing, N enrolled in a regular education program at the Whitney School, not the segregated IR program that the Board had proposed. N was periodically taken out of her regular class on a flexible schedule for one-to-one assistance with math and language. Linda Grimm continued to provide independent consulting *238 to ensure that N was in an inclusive program.

II. PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

The plaintiff parents move for summary judgment, asserting that they are prevailing parties, and as such, are entitled to recover costs and attorneys' fees pursuant to 20 U.S.C. § 1415(i)(3). The parties agree that there are no genuine disputes as to any material facts.

A. Standard of Review

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The burden is on the moving party to show that no material facts are in dispute. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party meets its burden, the opposing party must come forward with specific evidence that demonstrates that there is a genuine issue of material fact to be resolved at trial. Dusanenko v. Maloney, 726 F.2d 82, 84 (2d Cir.1984); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In determining whether or not a fact is material, the court will examine the applicable substantive law, as "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id. at 248, 106 S.Ct. 2505.

B. Discussion

1. Prevailing Party
The IDEA provides the "in any action or proceeding under this subsection, the court, in its discretion, may award reasonable attorneys' fees as part of the costs to the parents or guardians of a child or youth with a disability who is the prevailing party." 20 U.S.C. § 1415(e)(4)(B).
The plaintiff parents assert that they are "prevailing parties." They claim that the fundamental issue at stake was the basic placement of N and that their main goals in filing the request for a hearing were to challenge the IEP and to seek the appointment of a mutually acceptable independent inclusion consultant, points on which they succeeded. Since the time of the hearing, they argue, N has been placed in a regular classroom and is removed for only those periods when she is scheduled to receive special education services.
The Board, on the other hand, claims that the plaintiffs are not a prevailing party because the relief obtained was, at best, de minimis. The Board argues that the plaintiff parents failed to achieve their objective to have N placed at Stratford Academy and failed to have N placed full time in a regular classroom. The Board further emphasizes that the hearing officer's directive requiring independent evaluations is not a victory for the plaintiffs. The Board maintains that whatever relief was obtained was only of "intrinsic value" and therefore does not justify an award of fees and costs. In sum, the Board argues that because the plaintiff parents are not prevailing parties, there can be no award of fees and costs.
In assessing whether N's parents are prevailing parties, this court must first identify the relief sought by the plaintiffs and then must compare the requested relief with that obtained. See G.M. v. New Britain Bd. of Ed., 173 F.3d 77, 81 (2d Cir.1999); Christopher P. v. Marcus, 915 F.2d 794, 804 (2d Cir.1990), cert. denied, 498 U.S. 1123, 111 S.Ct. 1081, 112 L.Ed.2d 1186 (1991); see also, Institutionalized Juveniles v. Sec'y of Public Welfare, 758 F.2d 897, 911 (3d Cir.1985) (citing Bonnes v. Long, 599 F.2d 1316, 1319 (4th Cir.1979)), cert. denied, 455 U.S. 961, 102 S.Ct. 1476, 71 L.Ed.2d 681 (1982).
*239 Under the IDEA, a party is deemed "prevailing" if he succeeds on "any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." Texas State Teachers' Assoc. v. Garland Indep. Sch. Dist., 489 U.S. 782, 791-93, 109 S.Ct. 1486, 103 L.Ed.2d 866 (1989). In making its determination, a court must consider whether the plaintiffs (1) obtained relief on a significant claim in the litigation; (2) whether the relief materially altered the parties' legal relationship; and (3) whether the relief is more than de minimis in nature. Id. In other words,
[a] plaintiff may be considered a prevailing party even though the relief ultimately obtained is not identical to the relief demanded in the complaint, provided the relief obtained is of the same general type. Koster v. Perales, 903 F.2d 131, 134-35 (2d Cir.1990). [T]he most critical factor is the degree of relief obtained. Texas State Teachers Ass'n, 489 U.S. at 789, 109 S.Ct. 1486, 103 L.Ed.2d 866.
G.M. v. New Britain Bd. of Ed., 173 F.3d at 81.
As required by the law in this circuit, the court begins its analysis by examining the relief requested by N's parents. In their prehearing statement, the parents presented in writing the issues they wished to be addressed at the hearing: (1) whether N should be placed in a regular class with supplemental instruction; (2) whether N should attend the neighborhood magnet school with her siblings; and (3) whether N should ride the regular bus. The record reveals that there were other issues as well. N's parents sought an evaluation by an independent inclusion consultant and they wanted to improve the communication between home and school having weekly PPT meetings. Each goal will be addressed in turn.

a. Regular Classroom Setting/Propriety of IEP[10]
The parents sought an order directing N's placement in a regular classroom setting. The Board correctly points out that the hearing officer did not conclude that N should be placed full time in a regular classroom. Rather, she found that N's current placement was inappropriate and she ordered that a new IEP be designed. She further directed that the PPT consider inclusion as an alternative to the restrictive placement previously advocated by the PPT.
The defendant Board argues that the hearing officer's directive is a purely technical or de minimis victory because the hearing officer merely remanded the matter to the PPT for the design of a new IEP. It cites Hunger v. Leininger, 15 F.3d 664 (7th Cir.1994), cert. denied, 513 U.S. 839, 115 S.Ct. 123, 130 L.Ed.2d 67 (1994), in support of its claim that such "interim benefits" do not support a finding that the parents are prevailing parties. In Hunger, the court concluded that the parents were not prevailing parties because
[m]ostly they lost. They wanted to knock out the [IEP] for [their daughter]; they failed. They wanted an injunction against the withdrawal of the transitional services; they failed. They got an order for those [transitional] services but except for nine months of counseling by a social worker the services were never provided. So all they actually received was the smallest part of the inhome transitional services for nine months. And what is the value of those services? They had no intrinsic value; they were not rehabilitative; they were intended ... merely to facilitate her reentry into school. The services were terminated in November 1992 without *240 achieving that goal ... She is still at home.
Id. at 670.
The Board's argument in unavailing. Hunger is easily distinguished from the instant case. In this case, the Board wanted N placed in the restrictive IR program. Although the hearing officer did not mandate N's placement in an inclusive setting, she found that N's current placement was inappropriate. In addition, she concluded that N's IEP was deficient. These directives provided meaningful relief to N's parents when viewed in the context of what had transpired up until that point. At various PPT meetings, the Board maintained its commitment to placing N in a segregated program, apparently because it believed that the IEP called for such placement. In fact, it was the Board's position at the June 24, 1997 meeting (the meeting which precipitated the parents' request for the hearing) that N belonged in the IR program. Instead of approving the Board's plan for such placement, the hearing officer remanded the matter to begin anew the process of developing an individualized plan for N's education. In effect, she directed the PPT to consider inclusion as an option when drafting N's new IEPshe ordered that the inclusion matrix be completed and that the Board consider the plan of Dr. Kurker-Stewart, the Board's own inclusion expert, to transition N into a Stratford public school. Perhaps more to the point, pending the outcome of the evaluations and IEP, the Board was directed to place N in a regular classroom accompanied by a paraprofessional.
Under these circumstances, the hearing officer's failure to make a specific directive with regard to N's permanent placement does not impact the determination of whether N's parents are prevailing parties. Indeed, the hearing officer was unable to render a decision on that exact point because of the Board's failures up to that point. The fact that the hearing officer did not design a new IEP herself does not preclude a determination that N's parents are prevailing parties. See Mavis v. Sobol, 839 F.Supp. 968, 992 (N.D.N.Y.1993) (parents found to be prevailing parties where the district court determined that the defendant commissioner of education failed to offer a free appropriate public education and remanded the matter to the school district with an order that a new IEP be drafted.)

b. Stratford Academy
The hearing officer found in favor of the Board on the issue of whether N should be placed in her neighborhood magnet school as proposed by the parents.

c. Regular School Bus
During its closing argument before the hearing officer, the Board conceded that N could ride a regular school bus. At the hearing, the Board declared that it did not refuse N permission to ride a regular bus and that N's transportation would be dictated by the particular route for her neighborhood. This position is inconsistent with the earlier one advocated by Dr. Vespe. At the June 24, 1997 PPT meeting, he stated that N should ride a small van to school until she was capable of making the transition to a large bus. To the extent that N's transportation remained an issue, her parents prevailed.

d. Other Goals
This court's inquiry does not end with a comparison of the issues explicitly raised in the prehearing statement with the conclusions rendered by the hearing officer. Although not contained in their prehearing statement of issues, the record is clear that N's parents had other concerns in addition to the three recited above. N's parents clearly pressed the issues whether the Board was required to retain an independent consultant who believed in the merits of inclusive education and whether weekly PPT meetings were required.
*241 The parents' success on these points was causally related to their request for a hearing, and as such, supports a conclusion that they are prevailing parties. The Second Circuit recently approved the application of the Third Circuit's "causal connection" test:
Litigation is causally related to the relief obtained if it was a material contributing factor in bringing about the events that resulted in obtaining the desired relief. Litigation can be a material contributing factor if it changed the legal relations of the parties such that defendants were legally compelled to grant relief.
Alternatively, causation can be established through a "catalyst" theory, where even though the litigation did not result in favorable judgment, the pressure of the lawsuit was a material contributing factor in bringing about extrajudicial relief.
G.M. v. New Britain Bd. of Ed., 173 F.3d at 81. (Citations omitted).
The Board cites the case of Jodlowski v. Valley View Community Sch. Dist. # 365-U, 109 F.3d 1250 (7th Cir.1997) for the proposition that the plaintiffs' victory in having an independent evaluator appointed was, at best, de minimis. In Jodlowski, the parents filed a request for a due process hearing to investigate allegations of abuse and to determine whether the defendant school board was entitled to perform a complete case study evaluation of their child over their objections. After a due process hearing, it was held that the school board was entitled to complete the evaluation, but that the evaluation was to be completed not by board personnel, but by an independent consultant. The hearing officer declined to review the charges of abuse for want of jurisdiction. The parents then filed an application seeking attorneys' fees. In denying the parents' request for attorneys' fees, the Seventh Circuit held that they were not prevailing parties because they merely won the de minimis victory of having the evaluation performed by an independent consultant rather than a board employee. See id. at 1253. In reaching this conclusion, the Jodlowski court noted that the school board "got what it wanted: a complete case study evaluation of Nicholas." Id.
In this case, however, the Board did not "get what it wanted." All along, the Board steadfastedly relied upon the opinions rendered by Drs. Klin and Adamakos, both of whom supported N's segregation from a regular classroom setting. In addition, at the June 24, 1997 PPT meeting, the Board conveyed its resistance to the idea of retaining outside consultants. The hearing officer directed the Board to consider the programs suggested by outside consultants and the Board was directed to retain Linda Grimm, an advocate for inclusive placement, as a consultant and as N's case manager.
The record also reveals that N's parents, as well as the consultants they hired, pressed the issue of whether weekly meetings would be held. Dr. Peck and Ms. Whitbread specifically stated that efforts to correct N's behavior were not being coordinated between home and school. The lack of communication between home and school was recognized as being at least part of the problem causing N's behavioral difficulties. The victory of obtaining mandated weekly meetings is more than de minimis in nature when viewed in this context.
The court concludes that the parents are prevailing parties entitled to recover attorneys' fees. Although not every item of relief is identical to the relief demanded in their request for a hearing, the parents did achieve success on several significant issues  they blocked the Board's plan to have N placed in the segregated IR program; they succeeded in having the IEP declared deficient, thereby enabling them to engage in a new, dynamic process of designing a specialized education plan for their daughter; they succeeded insofar as the PPT was now required consider inclusion as a viable alternative to the segregated IR program previously advocated; they *242 succeeded in having an independent consultant and case manager appointed; and finally, they succeeded in having mandated weekly meetings.
The court now turns to the issue of determining a reasonable fee.

2. Attorneys' Fees and Costs
Once a movant meets the "prevailing party" threshold, the district court must then determine a reasonable fee. Hensley v. Eckerhart, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). In general, courts apply the "lodestar" method to determine a reasonable fee. Under this method, courts first estimate the number of hours worked, excluding hours which are excessive, duplicative or unnecessary; second, the court must determine the prevailing hourly rate for attorneys of similar experience within the geographic region; and finally, the court multiplies the hourly rate by the number of hours allowed. Blum v. Stenson, 465 U.S. 886, 897, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984).
The plaintiffs claim that based upon the prevailing market rate in the relevant market, the attorneys should be compensated as follows: Attorney David Shaw, $250.00 per hour; Attorney Roznoy, $150.00 per hour; and Attorney Feinstein, $195.00 per hour. Multiplying these rates by the hours spent and adding $5,426.04 in costs, the total award sought by the plaintiffs in this motion for summary judgment is $128,201.04.
The Board argues that the amount of attorneys' fees should be reduced because the plaintiffs' counsel achieved only partial success. Although "the degree of the plaintiff's success is not determinative of eligibility for attorney's fees, it is relevant to the size of the award." Chagnon v. Town of Shrewsbury, 901 F.Supp. 32, 36 (D.Mass.1995). Where a plaintiff achieves only partial or limited success, the district court is vested with the discretion to reduce the award accordingly. See id.; Hensley, 461 U.S. at 437, 103 S.Ct. 1933.
As the Second Circuit remarked in Grant v. Martinez, 973 F.2d 96, 101 (2d Cir.1992), cert. denied, 506 U.S. 1053, 113 S.Ct. 978, 122 L.Ed.2d 132 (1993):
The determination of the amount of the award does not end with the lodestar calculation. Although there is a "strong presumption' that the lodestar figure represents the `reasonable' fee," City of Burlington v. Dague, 505 U.S. 557, 562, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992), other considerations may lead to an upward or downward departure from the lodestar. See Hensley, 461 U.S. at 434, 103 S.Ct. 1933. The party advocating such a departure, however, bears the burden of establishing that an adjustment is necessary to the calculation of a reasonable fee. United States Football League v. National Football League, 887 F.2d 408, 413 (2d Cir.1989), cert. denied, 493 U.S. 1071, 110 S.Ct. 1116, 107 L.Ed.2d 1022 (1990).
[The defendant] argues that the lodestar should have been adjusted downward to reflect appellees' limited success. In Hensley, 461 U.S. at 434-37, 103 S.Ct. 1933, the Supreme Court set forth an analytic framework for determining whether a plaintiff's partial success requires a reduction in the lodestar. At step one of this analysis, the district court examines whether the plaintiff failed to succeed on any claims wholly unrelated to the claims on which the plaintiff succeeded. The hours spent on such unsuccessful claims should be excluded from the calculation. Id. at 434-35, 103 S.Ct. 1933; 2 Martin A. Schwartz & John E. Kirkland, Section 1983 Litigation 276-77 (2d ed.1991). At step two, the district court determines whether there are any unsuccessful claims interrelated with the successful claims. If such unsuccessful claims exist, the court must determine whether the plaintiff's level of success warrants a reduction in the fee award. Hensley, 461 U.S. at 436, 103 S.Ct. 1933; [2 Martin A. Schwartz & John E. Kirlin, Section *243 1983 Litigation, 276-77 (2d ed.1991).] If a plaintiff has obtained excellent results, however, the attorneys should be fully compensated. Hensley, 461 U.S. at 435, 103 S.Ct. 1933.
The Board asks this court to find that because the plaintiff parents were not successful at every juncture of this case, a reduction is warranted. Specifically, the Board submits that because the hearing officer did not require the Board to place N at the Stratford Academy, did not order her to be placed completely in a regular classroom setting, and because the plaintiff's second request for a due process hearing was rejected; see fn. 6; the reward should be reduced by 70%. The Board also asks that the award be reduced in light of the parents' failure on several ancillary aspects of the litigation.[11]
The court is not persuaded that such a high reduction is warranted. Although it is true that N's parents did not obtain each and every item of the relief sought, the time sheets submitted in support of their motion reveal that much of their attorneys' work on the various issues was intertwined. Moreover, the record reveals that the majority of the attorneys' time was devoted to issues pertaining to whether N's placement was proper, whether the IEP was sufficient and to consulting with experts. Of the main objectives the parents sought, they failed to succeed on only one  whether N should attend the magnet school with her siblings. In light of their failure on this issue as well as those described above, the court determines that a reduction of only 15% is warranted.
Based on the foregoing, the court determines that the plaintiffs should be awarded $108,970.88 in attorneys' fees and costs.

III. SUPPLEMENTARY MOTION FOR COSTS AND FEES SUBSEQUENT TO JANUARY 22, 1999 AND FOR REVISED COSTS (DOC. # 31).

In their supplemental motion, the plaintiff parents seek an additional $10,457.00 in attorneys' fees as well as an additional $5,210.30 in costs which was inadvertently left out of the plaintiffs' first application for fees.
The following additional facts are necessary for the resolution of this motion. On January 5, 1999, N's parents submitted a written statement to the PPT detailing their disappointment with the Board's implementation of the hearing officer's decision. They complained that Whitney School staff was not cooperating with the independent inclusion consultants, that the PPT had not properly considered Dr. Kurker-Stewart's transition plan and that their daughter was being denied an inclusive education. After corresponding with the Board on several occasions, the parents became concerned about what they perceived to be the Board's failure to implement the hearing officer's directives. They asked their attorney to intervene. On behalf of N's parents, their attorney wrote to the State Department of Education and demanded that enforcement action be taken. Ultimately, however, the state declined to act on the parents' request.
The defendant objects to the additional award of fees and costs for several reasons. First, the defendant argues that the plaintiffs may not recover for that portion of their attorney's time that was related to enforcement proceedings following the entry of the final administrative *244 order. The Board contends that because N's parents failed to achieve any relief from their enforcement attempts, they should not be awarded those fees which are attributable to that portion of the litigation. The court agrees. Because the plaintiff parents' post judgment enforcement attempts failed and their attempts are easily severable from the remainder of the litigation, the court reduces their award by $900.00 (3.6 hours × Attorney Shaw's $250.00 hourly fee). See Hensley, 461 U.S. at 436, 103 S.Ct. 1933.
Next, the defendant argues that N's parents cannot recover $195 per hour for Attorney Feinstein's time because he failed to provide the court with any information concerning his experience and billing rates. Any defect, however, has been cured by the submission of supplemental affidavits. See doc. # 39 and attachments thereto. Therefore, the court declines to reduce the award.
Finally, the defendant contends that N's parents are not entitled to certain costs and expert witness fees because they failed to offer evidence of the reasonableness and necessity of the expenses. The court has carefully reviewed the parties' submissions and finds that an award of the fees and costs requested is proper and reasonable. See P.S. and L.S. v. Contoocook Valley School District, 24 IDELR 1141, 1143 (D.N.H.1996).
Accordingly, the plaintiff parents' supplemental motion for costs and fees is GRANTED in part. The parents are entitled to an additional $9,557.00 (the amount requested, $10,457.00, minus $900 for the post-decision enforcement work).

IV. SUPPLEMENTARY MOTION FOR COSTS AND FEES SUBSEQUENT TO JUNE 10, 1999 SUPPLEMENTARY MOTION (DOC. # 38)

The plaintiff parents seeks additional fees and costs for the work their attorneys did on the reply brief (doc. # 39). A plaintiff's recovery of attorneys' fees for work done in connection with fee application is appropriate. Gagne v. Maher, 594 F.2d 336, 343 (2d Cir.1979), aff'd, 448 U.S. 122, 100 S.Ct. 2570, 65 L.Ed.2d 653 (1980). Accordingly, the parents' motion is GRANTED. The court finds that supplemental fees in the amount of $3,570.00 are appropriate.

V. CONCLUSION

Based on the foregoing, the court recommends that the Plaintiffs' motions (doc. 25, 31, 38) be GRANTED in part. The plaintiffs should be awarded the sum of $122,097.88 in fees and costs.
Either party may seek the district judge's review of this recommendation. See 28 U.S.C. § 636(b) (written objections to ruling must be filed within ten days after service of same); Fed.R.Civ.P. 6(a), 6(e) 772; Rule 2 of the Local Rules for United States Magistrate Judges, United States District Court for the District of Connecticut; Thomas v. Arn, 474 U.S. 140, 155, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir.1992) (failure to file a timely objection to Magistrate Judge's recommended ruling waives any further review of the ruling).
Dated at New Haven, Connecticut this 30th day of September, 1999.
NOTES
[1] These objections, labeled by the Board as errors of law, are:

(1) The Magistrate's Recommended Ruling fails to deal with the dispute of fact between the parties regarding the central purpose for the parents' due process hearing request, instead finding that "there are no genuine issues of fact."
(2) ****
(3) The Magistrate's Recommended Ruling conflates the hearing officer's finding that the IEP was procedurally defective with a finding (never made by the hearing officer) that the program and placement offered by the Board for the 1997-98 school year was inadequate.
(4) The Magistrate's Recommended Ruling adopts the characterization of the parents and finds as a matter of undisputed fact that after the hearing, N. was placed in a wholly different program from that proposed before the due process hearing, without an acknowledgement that this characterization is strongly disputed by the Board through the affidavit of Dr. Vespe.
(5) The Magistrate's Recommended Ruling finds as a matter of undisputed fact that the hearing officer could not order a specific IEP following the due process hearing because "of the Board's failures up to that point," ignoring the hearing officer's findings regarding the completion of the evaluation process.
Objection at 3-4.
[2] The Board did file an affidavit of Dr. Angelo Vespe several weeks after filing its brief in opposition to the motion for summary judgment. That affidavit was before Judge Martinez when she issued her Recommended Ruling.
[3] This order adopts the Recommended Ruling with the following corrections: On page 10, the phrase "weekly PPT meetings" should read "weekly team meetings." On page 10 at footnote 7, the reference to "fn. 7" should be to fn. 5. On page 27, the phrase "the reward should be reduced" should read "the award should be reduced."
[4] The Board also argues that it disputes, through Dr. Vespe's affidavit, the characterization of the Intensive Resource ("IR") program and the program offered to N by the Board for the 1997-98 school year as a "segregated program." Opposition at 11. These are not material issues of fact. Dr. Vespe's affidavit does not dispute the hearing officer's findings of fact that the IR program at the Whitney School, where N. was placed for the 1997-98 school year, consists of "self-contained classrooms with four to five students per room, each of whom has intense special education needs.... All the IR children spend some time in a regular education classroom. ... The IR teachers do not provide support in the regular education classroom." Final Decision and Order at 8, ¶ 16. Nor does his affidavit directly characterize the IR program as "segregated" or not. Dr. Vespe's affidavit does indicate, however, that following the hearing at least some of N.'s IR services have been provided to her in the regular classroom, Vespe Affidavit at ¶¶ 16-20, making her post-hearing program less "segregated" than her pre-hearing program. Thus, the Vespe affidavit is consistent with the Recommended Ruling in all material respects.
[5] The hourly rates sought are consistent with prevailing rates in this District. The only rate potentially out of line is that for Attorney Roznoy, who is billed at $150 per hour presently. Attorney Roznoy's level of experience is unclear from the record. See Pl.'s Memorandum of Law in Support of Motion for Summary Judgment at 28 ("Attorney Roznoy served the plaintiff on this case within the services provided by the Law Offices of David C Shaw. Reimbursement for the time of Attorney Roznoy is sought at $150 per hour. This rate is consistent with the billing practices of private firms. Attachment # 17, ¶ 10."); Affid. of John C. Yavis, Jr. at ¶ 10, Attachment # 17 to Pl.'s Memorandum of Law in Support of Motion for Summary Judgment ("In my opinion, the rate charged by private law firms in Connecticut for an associate attorney in a law firm with between one and two years of experience is at least $125 per hour.") (emphasis added); Declaration of David C. Shaw in Support of Motion for Attorneys' Fees and Costs at ¶ 8, Attachment # 22 to Pl.'s Memorandum of Law in Support of Motion for Summary Judgment ("My associate, Attorney Roznoy, during the period March 16, 1998 through March 20, 1998 spent 21.4 hours working on this case. Our office's billing rate for Attorney Roznoy is $150 per hour."). If Attorney Roznoy were a first-year associate, the rate of $150 would be somewhat high. Attorney Roznoy's time was incurred in 1998, however, and his billing rate, which reflects his level of experience in January 1999 (and so is probably now somewhat outdated), is within an acceptable range. The Second Circuit has approved of the use of current billing rates, rather than historic billing rates, if the services were rendered over the past two or three years. See New York State Association of Retarded Children, Inc. v. Carey, 711 F.2d 1136, 1153 (2d Cir.1983).
[6] Not included among the items subtracted were entries for time to prepare for and attend the hearings. Although it is possible to identify certain days of the hearing as pertaining to specific issues, eliminating that time would result in an overly stingy award. Preparation for a day of hearing on one subject may well prove beneficial to preparation for another hearing on another issue. Similarly, meetings with experts who either did not testify or who were retained for a specific issue that plaintiff lost quite likely involved broader discussions that proved to be of assistance with other issues.
[7] The Board identified 124.7 hours of Attorney Shaw's time, other than preparation for and attendance at hearings, that it claimed related to issues the plaintiff lost. After adjustment to add back time spent preparing for and attending the hearing, about 58.2 hours was expended on losing issues. This translates to a reduction of about $14,550, leaving about $98,775 of Attorney Shaw's time. The Board identified all of the $3,210 attributed to Attorney Roznoy, but none of the time attributed to Attorney Feinstein, as relating to issues the plaintiff lost. Eliminating Attorney Roznoy's time and adding Attorney Feinstein's $6,240 to Attorney Shaw's $98,775, results in a total of $105,015.
[1] N has never been definitively diagnosed; the parties agree, however, that she has developmental delays as well as moderate mental retardation.
[2] "Mainstreaming" is the process of integrating children with disabilities into a regular classroom. See Mavis v. Sobol, 839 F.Supp. 968, 971 fn. 7 (N.D.N.Y.1994). In recent years, the term has become less popular and many educators prefer to use the term "inclusion." See id.
[3] A Planning and Placement Team is the group of parents, educators and administrators which determines where a disabled child should be placed and what services he or she requires. See generally 20 U.S.C. § 1414(d)(1)(B) (Supp.1998); Conn.Gen.Stat. §§ 10-76a et seq.
[4] 20 U.S.C. § 1401(20) provides:

The term "individualized education program" means a written statement for each child with a disability developed in any meeting by a representative of the local educational agency or an intermediate educational unit who shall be qualified to provide, or supervise the provision of, specially designed instruction to meet the unique needs of children with disabilities, the teacher, the parents or guardian of such child, and, whenever appropriate, such child, which statement shall include
(A) a statement of the present levels of educational performance of such child,
(B) a statement of annual goals, including short-term instructional objectives,
(C) a statement of the specific educational services to be provided to such child, and the extent to which such child will be able to participate in regular educational programs,
(D) a statement of the needed transition services for students beginning no later than age 16 and annually thereafter (and, when determined appropriate for the individual, beginning at age 14 or younger), including, when appropriate, the a statement of the interagency responsibilities or linkages (or both) before the student leaves the school setting,
(E) the projected date for initiation and anticipated duration of such services, and
(F) appropriate objective criteria and evaluation procedures and schedules for determining, on at least an annual basis, whether instructional objectives are being achieved.
In the case where a participating agency, other than the educational agency, fails to provide agreed upon services, the educational agency shall reconvene the IEP team to identify alternative strategies to meet the transition objectives.
[5] Dr. Elizabeth Kurker-Stewart had been retained as the Board's inclusion consultant. N's parents believed that she was too closely aligned with the Board to be objective about what was best for N.
[6] Congress granted the parents of a disabled child the right to seek review of their child's IEP. See 20 U.S.C. § 1415(b)(2). In Connecticut this procedure has been codified in Conn. Gen.Stat. § 10-76h. This statute provides that the parents of a disabled child may request a hearing to challenge the PPT's decision regarding the placement of their child. The hearing is held before an impartial hearing officer who has the authority to hear relevant testimony and render a decision which confirms, modifies or rejects the PPT's placement recommendations.
[7] For the reasons discussed in fn. 7, N's parents objected to the Board's inclusion consultant, Dr. Elizabeth Kurker-Stewart.
[8] At a PPT meeting on January 8, 1998, the Board announced that Drs. Kurker-Stewart, Klin and Dr. Adamakos would observe and evaluate N. N's parents did not consent to the evaluations and filed a second request for due process hearing against both the Stratford and Fairfield school boards. The parents raised the issue of whether the Board could have its own consultants observe N at school without their consent. The second request for a hearing was consolidated into the first. On April 6, 1998, the hearing officer issued an interim order. She concluded that the Board need not obtain parental consent for Drs. Kurker-Stewart and Klin to observe N because their observations were used only to prepare for the due process hearing. She also concluded, however, that Dr. Adamakos could not observe N without parental consent because his observations were not being used to prepare for the hearing, but rather as part N's ongoing educational planning.
[9] The Board and N's parents agreed that Ms. Grimm would serve as N's independent program manager. The selection of Ms. Grimm was part of the administrative process and was overseen by the hearing officer.
[10] Although the parents did not list the issue of whether N's IEP was adequate in their prehearing list of issues, the court addresses these two issues together. The record is clear that the propriety of N's IEP was a major issue and of paramount importance to N's parents. Moreover, the propriety of the IEP is so intertwined with the issue of whether N was to be placed in a mainstream setting as to be inextricable.
[11] The Board contends that the award should be reduced because the parents did not succeed on their second request for a due process hearing and the motion to exclude testimony by Dr. Vespe In addition, the Board argues that the award should be reduced because the parents' allegations that N had been abused by school staff were found to be without merit. Finally, the Board asserts that the parents should not be awarded those fees and costs incurred with the procurement of their expert, Dr. Sapon-Shevin. The court finds it unnecessary to address the merits of each and every aspect of the litigation on which the Board claims the parents did not prevail. These arguments are subsumed by the claim that the parents are entitled to a partial fee.