Sean DOUGLAS, Plaintiff,

v.

**CITY OF WATERBURY and Silas Bronson Library, Defendants.**

No.  3:05CV01051(DJS).

United States District Court, D. Connecticut.

June 29, 2007.

Raymond J. Savoy, Middlebury, CT, for Plaintiff.

Paula N. Anthony, Corporation Counsel's Office, Waterbury, CT, for Defendants.

## MEMORANDUM OF DECISION AND ORDER

SQUATRITO, District Judge.

The Plaintiff, Sean Douglas ("Douglas"), brought this action against the Defendants, the City of Waterbury ("the City") and the Silas Bronson Library ("the Library") (collectively, "the Defendants"),[1] alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et. seq.* Specifically, Douglas alleges that he was harassed, subjected to a hostile work environment, and transferred to another department within the Library based on his race. Douglas also alleges that the Defendants terminated him in retaliation for filing internal complaints, and for filing complaints with the Connecticut Commission on Human Rights and Opportunities ("CHRO") and the Equal Employment Opportunity Commission ("EEOC"). Now pending is the Defendants' motion for summary judgment (**dkt.# 27**) pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons stated herein, the Defendants' motion for summary judgment (**dkt.# 27**) is **GRANTED.**

## I.  THE PLAINTIFF'S SUBMISSIONS

Before setting forth the background facts of this case, the court notes that Douglas has failed to comply with Rule 56 of the Local Rules of Civil Procedure for the District of Connecticut ("D.Conn.L.Civ. R."). Local Rule 56(a)(1) provides that "[t]here shall be annexed to a motion for summary judgment a document entitled 'Local Rule 56(a)1 Statement,' which sets forth in separately numbered paragraphs . . . a concise statement of each material fact as to which the moving party contends there is no genuine issue to be tried." D. Conn. L. Civ. R. 56(a)(1). Under Local Rule 56(a)(2),

> [t]he papers opposing a motion for summary judgment shall include a document entitled "Local Rule 56(a)2 Statement," which states in separately numbered paragraphs . . . corresponding to the paragraphs contained in the moving party's Local Rule 56(a)1 Statement whether each of the facts asserted by the moving party is admitted or denied.

D. Conn. L. Civ. R. 56(a)(2). In its Local Rule 56(a)(2) Statement, the party opposing summary judgment must also set forth, in a separate section, "Disputed Issues of Material Fact." D. Conn. L. Civ. R. 56(a)(2). "All material facts set forth in [the moving party's Local Rule 56(a)1] [S]tatement and supported by the evidence will be deemed admitted unless controverted by the statement required to be filed and served by the opposing party in accordance with Local Rule 56(a)2." D. Conn. L. Civ. R. 56(a)(1). Although Douglas has filed an opposition memorandum, he has

---

1. As the Defendants point out, the Library is a department of the City, not a separate legal entity.

not filed a Local Rule 56(a)(2) Statement in response to the Defendants' Local Rule 56(a)(1) Statement.[2]

With regard to motions for summary judgment, Rule 56 of the Federal Rules of Civil Procedure "does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute." *Amnesty Am. v. Town of W. Hartford,* 288 F.3d 467, 470 (2d Cir.2002). The District of Connecticut has set forth rules that are meant to assist the court when reviewing summary judgment motions. "The purpose of [Local] Rule 56 is to aid the court, by directing it to the material facts that the movant claims are undisputed and that the party opposing the motion claims are disputed." *Coger v. Connecticut,* 309 F.Supp.2d 274, 277 (D.Conn.2004). "Absent such a rule, 'the court is left to dig through a voluminous record, searching for material issues of fact without the aid of the parties.'" *S.E.C. v. Global Telecom Servs., L.L.C.,* 325 F.Supp.2d 94, 108 (D.Conn.2004) (quoting *N.S. v. Stratford Bd. of Educ.,* 97 F.Supp.2d 224, 227 (D.Conn.2000)). "The Local Rules provide clear notice that 'failure to provide specific citations to evidence in the record as required by this Local Rule may result in sanctions, including ... when the opponent fails to comply, an order granting the motion.'" *Id.* at 108–09 (quoting D. Conn. L. Civ. R. 56(a)(3)).

Although Douglas' failure to comply with the Local Rules could, by itself, result in the court granting summary judgment in favor of the Defendants, the court shall consider Douglas' memorandum opposing summary judgment. Nevertheless, for the purposes of this motion, the court shall deem admitted all facts set forth in the Defendants' compliant Local Rule 56(a)(1) Statement that are supported by the evidence.[3]

## II. FACTS

In August 2002, Douglas, who is African–American, was hired by the City as a Clerk II/Typist at the Library, subject to a six-month probationary period. Leo Flanagan ("Flanagan"), Director of the Library, assigned Douglas to Circulation Services, under the direct supervision of Emmet McSweeney ("McSweeney"), the head of Circulation Services.[4] Upon his

2. Although the Defendants have submitted a document entitled "Statement of Material Facts Not in Dispute" brought "[p]ursuant to ... Local Rule 9(c)(1)," it is clear that this document is the Defendants' Local Rule 56(a)(1) Statement. "Local Rule 9" is simply the previous designation of what is now Local Rule 56, and the Defendants' submission complies with Local Rule 56(a)(1).

3. The court is aware that "in determining whether the moving party has met this burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts contained in the moving party's [Local] Rule 56[ ] statement. It must be satisfied that the citation to evidence in the record supports the assertion." *Vt. Teddy Bear Co., Inc. v. 1–800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir. 2004); *see Giannullo v. City of New York,* 322 F.3d 139, 143 n. 5 (2d Cir.2003) (stating that,

"although [Local] Rule 56[ ] is designed to streamline the district court's consideration of summary judgment motions," not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts"). Here, upon review of the evidence cited by the Defendants in the Local Rule 56(a)(1) Statement, the court is satisfied that the Defendants' citations to the record support their assertions.

4. The Library is divided into five (5) divisions or service areas: Administrative Services, Adult Information Services, Children's Services, Circulation Services, and Technical Services. (*See* dkt. # 28, Ex. A ¶ 5.) Each division or services area consists of a head of the division, who is responsible for operation and supervision; a Librarian II or III, who is responsible for supervising staff; and

hiring, Douglas was made aware of the Library's policies and procedures. Among the policies that Douglas was made aware of were that employee absences must be authorized in advance by the employee's supervisor; employees must conduct personal matters during break time; employees must obtain authorization and sign out before leaving their work area; and an employee's refusal to follow a supervisor's directives constitutes insubordination. (*See* dkt. # 28, Exs. F & G).

On November 12, 2002, Douglas received a three-month interim probationary performance evaluation from McSweeney, which was approved by Flanagan. In his evaluation, McSweeney recommended that the Library continue to employ Douglas, and noted that he interacted with both the staff and Library patrons "in an extremely warm and welcoming manner." (*See id.*, Ex. H) The evaluation also stated, however, that Douglas needed "an overview of Circulation Division procedures" so that he may "be prepared to explain them to the public," and that Douglas needed to "improve his weekend tardiness." (*See id.*) Overall, McSweeney concluded that Douglas was "potentially an excellent employee who will get added training." (*See id.*)

On February 13, 2003, Douglas received his six-month probationary performance evaluation from McSweeney, which was also approved by Flanagan. Again, Douglas was recommended for continued employment. McSweeney noted that Douglas was outgoing, personable, and was capable of explaining Library procedures in a calming manner, and that he kept an eye on the security of patrons and library material. (*See id.*, Ex. I) Once again, though, McSweeney made note of Douglas' "tardiness problem throughout his employment," stating that Douglas had been late to work a number of times. (*See id.*)

Clerk/Typist IIs and Librarian Assistants.

Indeed, McSweeny noted that Douglas' "occasions of lateness are serious enough to constitute grounds for a verbal warning." (See id.) Overall, McSweeney characterized Douglas as "capable, excellent with the public. Mr. Douglas needs to improve his productivity by moving his fan club along. Mr. Douglas has great, but untapped potential." (*See id.*)

Douglas' problem with tardiness and absenteeism appears to have continued after his February performance evaluation. On April 22, 2003, Flanagan warned Douglas about his tardiness in a letter, which noted four separate instances during the months of March and April that Douglas was late to work without notice or explanation. (*See id.*, Ex. K.) On April 28, 2003, Flanagan gave Douglas a disciplinary warning for an unexcused absence of three consecutive days. (*See id.*, Ex. L.) Flanagan chose, though, not to dismiss, demote, or suspend Douglas at that time. (*See id.*) On May 16, 2003, Flanagan sent Douglas a memorandum regarding Douglas' continued absenteeism and tardiness. (*See id.*, Ex. M.) In the May 16, 2003 memorandum, Flanagan noted that Douglas had been tardy every day in the preceding pay period, and instructed Douglas to meet with Flanagan regarding his tardiness. (*See id.*) Flanagan states that, on June 6, 2003, he met with Douglas' union representatives in order to discuss Douglas' tardiness and absenteeism problems. (*See id.*, Ex. A ¶ 13.)

Tardiness and absenteeism apparently were not Douglas' only breaches of Library policy. On June 11, 2003, Flanagan sent Douglas a memorandum notifying him that he was in violation of the Library dress code by continually appearing for work at the front desk in a T-shirt. (*See id.*, Ex. N.) Included in that memorandum

(*See id.* ¶ 6.)

were Flanagan's representations that Douglas had demanded that "the Library fund [his] wardrobe if [he is] to comply with Library rules," and that Douglas stated that he "will comply [with the Library's dress code] when [he] is 'ready.'" (*See id.*)

On June 12, 2003, Flanagan followed up his meeting with Douglas' union representatives with a memorandum. (*See id.*, Ex. O.) In the June 12, 2003 memorandum, Flanagan states that Douglas' unexcused absence of three consecutive days was "the worst case [of absenteeism and tardiness] in many years at the Library," and he asked the union representatives to "sign off on the first and second letters of warning" for Douglas. (*See id.*) Still, Flanagan stated in the memorandum that he was reluctant to pursue a harsher course of action. (*See id.*)[5]

On June 16, 2003, Flanagan sent Douglas a letter constituting "a verbal disciplinary warning" for Douglas' "tardiness and absenteeism [in] March and April 2003," and for Douglas' failure to comply with Library policy by not "inform[ing][his] supervisor of absence or tardiness." (*See id.*, Ex. P.) Flanagan noted that Douglas "could be dismissed, suspended or demoted" because of his conduct, but Flanagan chose not "to dismiss, demote, or suspend [Douglas] at this point" because his "administration has been characterized ... by 'giving an employee an extra chance.'" (*See id.*) Flanagan cautioned Douglas "to avoid unexcused absence, and repeated excessive tardiness, and to follow the Library's notification procedures, or Civil Service rules will be enforced." (*See id.*)

On August 22, 2003, Flanagan sent Douglas a letter regarding Douglas' apparent abuse of the City's sick leave policy.

(*See id.*, Ex. Q.) In that letter, Flanagan states he was informed by McSweeney that, on August 22, 2003, Douglas had called the Library to inform his supervisor that he would be out sick that day. (*See id.*) Nevertheless, Douglas apparently appeared at the Library's circulation desk at approximately 9:15 a.m.; McSweeney asked Douglas if he had recovered and was ready to work, and Douglas apparently replied that he was taking a nephew to New York City. (*See id.*) In the letter, Flanagan wrote to Douglas, "If these events are correctly reported[,] your behavior constitutes the most audacious disregard for City sick leave rules that I have ever seen. You may have willfully given false statements and willfully abused City sick leave policy." (*See id.*) Flanagan further wrote to Douglas, "given your record of tardiness and absenteeism from the time of your employment probation, I am scheduling a disciplinary hearing regarding your August 22 absence on August 28 at 11 a.m. in my office." (*See id.*) In addition to this letter, Flanagan also sent to Douglas a memorandum, dated August 22, 2003, regarding Douglas' apparent failure to properly punch out for lunch on the Library's time clock. (*See id.*, Ex. R.)

Flanagan states that, in September 2003, Douglas was reassigned to Technical Services because of an anticipated staffing shortage in that department. (*See id.*, Ex. A¶ 15.) According to Flanagan, "Douglas' re-assignment was consistent with long-standing Library policy to cross-train entry-level employees in complimentary areas of the Library." (*See id.*) In a memorandum, dated October 6, 2003, to Jim Gallett ("Gallett"), the Head of Technical Services, Flanagan states that he decided

---

**5.** The Defendants state that Exhibit O, which is the June 12, 2003 memorandum, "is submitted only for purposes of presenting a complete timeline of events regarding Plaintiff's work issues. The City and the Union subsequently reached a compromise and reduced this to a second warning letter." (Dkt. # 27, Def.'s Local Rule 56(a)(1) Statement, n. 1)

to keep Douglas in Technical Services and to have Gallett orient Douglas not only to the clerical aspects of acquisitions but to the clerical responsibilities of Technical Services overall. (*See id.*, Ex. S.) Flanagan informed Gallett that Douglas "can assist [Gallett] in the basement collection reorganization." (*See id.*) Still, Flanagan told Gallett that he would "loan" Gallett's staff members, including Douglas, to Circulation Services on those occasions when Circulation Services is short-staffed. (*See id.*) Flanagan stated that "[Gallett's] staff will thus remain familiar with Circulation procedures so they may function easily in either Technical Services or Circulation. Cross training has been the Library's objective for over a dozen years." (*See id.*) McSweeney maintains that on at least two occasions, Douglas, after being transferred to Technical Services, "exhibited disrespectful behavior towards [him] as a supervisor when asked to stop distracting a Circulation Services staff member and return to his work area." (*See id.*, Ex. B ¶ 12)

Flanagan sent Douglas a memorandum, dated October 22, 2003, in which Flanagan discussed Douglas' complaints about a coworker, Thomas Roche ("Roche"). (*See id.*, Ex. T.) Apparently, Douglas complained that Roche was involved in "three public scenes" with Library patrons, one of which involved Douglas himself. In the memorandum, Flanagan states that "[i]n each case, [the] administrative decision has been to counsel Mr. Roche[,] who has no public service experience and is in probationary training. . . ." (*See id.*) The memorandum also states that Douglas' "charge that the Library Administration 'regularly' overlooks personnel problems and delays action on them is . . . unfounded . . . . That you [Douglas] did not raise this concern with me for 3 weeks, and then issued a broad statement of unverified criticism[,] is most troubling." (*See id.*) Flanagan then

informed Douglas on how to properly bring his concerns to the administration in the future. (See id.)

On November 24, 2003, Douglas filed a complaint with the CHRO, alleging that he had been harassed and transferred between departments because of his race and color (*See id.*, Ex. U.) In the November 24, 2003 CHRO complaint, Douglas claimed that Maryanne Flanagan, who apparently is Flanagan's wife and works at the Library, subjected Douglas to a hostile work environment; Douglas alleges that he reported this to Flanagan, who then "began to treat [him] with animus, because I had . . . reported his wife, and the harassment she was subjecting me to." (*See id.*) Douglas also maintains that he "was transferred allegedly because [he] had threaten [sic] a white male coworker[,] Tom Roach [sic]," and that although the Library "never conducted any type of investigation . . . . [he] was still transferred based solely on an allegation from a white coworker." (*See id.*)

In January 2004, upon the departure of Gallett, Flanagan appointed Barry Bruce ("Bruce") as Acting Head of Technical Services. (*See id.*, Exs. A ¶ 17 & C ¶ 5.) Bruce states that, as the Head of Technical Services, he was responsible for the operation and supervision of that division and its staff. (*See id.*, Ex. C ¶ 6.) Bruce further states that, as part of his duties, he was required to prepare performance evaluations of his staff, and in order to facilitate these evaluations, he began to keep a supervisor's log of the Technical Services staff, including Douglas. (*See id.* ¶¶ 6–7.)

Between January 20 and 26, 2004, Douglas filed three separate internal complaints against Bruce and Bruce's assistant supervisor, Heston Clapp ("Clapp"), alleging harassment. (*See id.*, Exs. V, W, & X.) In the first internal complaint, dated January

20, 2004, Douglas represents that Bruce asked Douglas to "withdraw some books" for him. (*See id.,* Ex. V.) According to Douglas, Bruce was upset that Douglas had not performed that task quickly enough, and informed Douglas of his displeasure. (*See id.*) Douglas states that he told Bruce, "don't walk up on me getting in my face again, especially when I said I would do [the task], if you do it again, you're going to do [it], because I'm not, I do not have to jump at your request for something that is for you to do." (*See id.*) Bruce apparently called Douglas "a foolish and ignorant young man." (*See id.*) The internal complaint further represents that Bruce and Douglas both stated that they were not showing respect for each other. (*See id.*)

In the second internal complaint, dated January 23, 2004, Douglas represents that Bruce, on his first day as supervisor, asked to have a meeting with Douglas. (*See id.,* Ex. W.) According to Douglas, Bruce called Douglas into a meeting to inform him that he expected Douglas to perform his duties "in a timely fashion without any problems." (*See id.*) Douglas states that he did not appreciate Bruce's attempt to "single [him] out" and "embarrass" him by putting him "in [his] place in front of the department." (*See id.*) Douglas apparently told Bruce, "I expect a very high level of respect and professionalism in your treatment, and communication with me. The respect and professionalism that you show towards me, or lack there of [sic], is what you will receive in return." (*See id.*) Douglas then states that Bruce began detailing a job duty for Douglas, to which Douglas responds, "I am requesting an outline of my duties to be done. While everyone in the department has specific duties that do not have to be dictated daily to them, why do you feel you constantly must give me daily direction?" (*See id.*) At that point, Clapp apparently made the comment, "If I tell you to close the door, do you need it written down, or instructions on how to close the door also?", to which Douglas replied, "Mind your business, no one is talking to you." (*See id.*) Bruce then accused Douglas of being "rude, and disrespectful," stated that Douglas was "refusing work," and accused Douglas of "insubordination." (*See id.*) According to Douglas, Bruce wrote about this incident in a notepad. (*See id.*)

In the third internal complaint, dated January 26, 2004, Douglas represents that, as he was returning phone calls made to him while he was on a break, Clapp, "who had been watching [him] with some sort of sneer," told Douglas "in a rude, and somewhat aggravated tone, 'Can you get off the phone?'" (*See id.,* Ex. X.) After he got off the phone, Douglas spoke with Clapp, who apparently said that Douglas' phone usage was "bothering" her and "distracting [her] from [her] work." (*See id.*) Douglas apparently replied, "If you would not try to listen to what I was talking about, by spying, you would not be distracted from doing your work." (*See id.*) Bruce then came up to Clapp and Douglas, and asked why Douglas was speaking to Clapp in that manner, to which Douglas stated, "I am not talking to you, and this is not your business." (*See id.*) Bruce disagreed, stating that this was his business, to which Douglas replied, "I am not your son, nor your slave, nor your child, or property, so do not walk up in my face attempting to intimidate me, and mind your business." (*See id.*) Bruce then apparently stated to another Library employee, "See what I mean, see what type of person he is?", and called Douglas "pitiful and ignorant." (*See id.*) According to Douglas, this exchange continued in a similar manner until Douglas left the department to go to Flanagan's office. (*See id.*)

On January 26, 2004, Douglas requested a transfer to another department within the Library due to the "unsafe and hostile work environment" allegedly caused by Bruce and Clapp. (*See id.*, Ex. Y.) In response, Flanagan sent to Douglas a memorandum, dated January 27, 2004, in which he stated that he had followed up Douglas' complaints, interviewed all the involved parties, and determined that Douglas' claims were unsubstantiated. (*See id.*, Ex. Z.) Indeed, instead of finding support for Douglas' claims, Flanagan concluded that there was evidence of "grossly inadequate job performance on [Douglas'] part, and refusal to accept direction from Technical Services manager Bruce and assistant manager, Heston Clapp." (*See id.*) Flanagan then informed Douglas that, because he apparently "refus[ed] simple orders and shout[ed] at Mr. Bruce [a] half dozen times that he is a 'liar,'" he would be subject to a hearing. (*See id.*)

Bruce, for his part, maintains that, between January 2004 and mid-March 2004, he documented and reported to Flanagan over thirty instances of tardiness, absenteeism and insubordination involving Douglas. (*See id.*, Ex. C ¶ 8.) For example, Bruce represents that, on March 10, 2004, he questioned Douglas regarding his interaction with a coworker. (*See id.* ¶ 9.) Apparently, that interaction had brought the coworker to tears. (*See id.*) Bruce maintains that, when questioned about the incident, "Douglas responded in a very rude and disrespectful manner, shouting at me, and challenging me with 'What are you going to do about it?'" (*See id.* ¶ 10.) Bruce states that Douglas "was in very close proximity to [his] face, and [he] feared for [his] personal safety." (*See id.*) Bruce called Flanagan to the scene, (*see id.* ¶ 11; id., Ex. A ¶ 21), and when Flanagan arrived he directed Douglas to report to his office, (*see id.* Ex. A ¶ 21). According to Flanagan, Douglas ignored this direction, responding "You can't tell me what to do." (*See id.*, Ex. A ¶ 21; *see also id.*, Ex C. ¶ 11.)

On March 11, 2004, Flanagan issued to Douglas a notice of a pre-disciplinary hearing, scheduled for March 17, 2004, to consider suspending or terminating Douglas' employment due to various charges of insubordination. (*See id.*, Ex. BB.) Douglas was also placed on one-day administrative leave without pay for March 10, 2004, and was instructed to report to work as scheduled until his hearing on March 17, 2004. (*See id.*) Despite these instructions, Flanagan and Bruce state that, on March 15, 2005, Douglas arrived to work late and had numerous unexcused absences from his work area throughout the day. (*See id.*, Exs. A ¶ 23 & C ¶ 13.)

Flanagan maintains that, on March 17, 2004, Douglas attended the pre-disciplinary hearing with his union representatives and was given the opportunity to present his version of the incidents set forth in the March 11, 2004 notice. (*See id.*, Ex. A ¶ 24.) On April 5, 2004, the City issued Douglas a notice stating that his employment at the Library was terminated that day for the reasons set forth in the March 11, 2004 notice and in the March 17, 2004 pre-disciplinary hearing. (*See id.*, Ex. CC.)

On April 7, 2004, Douglas filed a number of grievances with the Waterbury City Employees Association. (*See id.*, Exs. DD–GG.) Specifically, Douglas alleged discrimination, discharge without just cause, retaliation for filing a discrimination grievance; he further alleged that Flanagan had repeatedly placed derogatory material in his file. (*See id.*, Exs. DD–GG.) On April 28, 2004, Douglas' CHRO complaint was amended to include allegations of discrimination based on his termination. (*See id.*, Ex. HH.) On June 22, 2004, Douglas

and the union executed a letter of Withdrawal of Union Representative, wherein Douglas released the Union from representing him in his grievances against the City. (*See id.*, Ex. II.)

On February 14, 2005, an arbitration hearing regarding Douglas' grievances was held by the State Board of Mediation and Arbitration. (*See id.*, Exs. DD–GG.) Douglas did not attend this hearing, and was represented by private counsel. (*See id.*) The arbitration panel determined that Douglas' termination was for just cause, and that it had no jurisdiction to determine whether Douglas was retaliated against because he filed a complaint with CHRO or because he was engaged in protected activities. (*See id.*) Douglas did not seek to vacate, modify, or correct the arbitration board's decision. (*See id.*, Ex. KK ¶ 7.)

### III. DISCUSSION

In his Complaint, Douglas alleges that the Defendants discriminated against him because of his race, in violation of 42 U.S.C. § 2000e–2(a), by "harassing and subjecting [him] to a hostile work environment," "transferring [him] to another department because of an alleged incident with a white co-worker," and "failing to take appropriate action to remedy fully the effects of discrimination against [him]." (See dkt. # 1 ¶ 10.) Douglas further alleges that the Defendants retaliated against him, in violation of 42 U.S.C. § 2000e–3(a), by "[s]ubjecting [him] to harassment that adversely affected the terms, conditions, and privileges of his employment because he opposed employment practices on the basis of race, . . . filed several internal complaints of discrimination and harassment with the Defendant[s], and . . . filed a charge of discrimination and harassment with the CHRO and EEOC"; and "[a]lleging that [he] was insubordinate on twelve

occasions during a six-week period after he filed charges of discrimination and harassment with the CHRO and EEOC." (*See* dkt. # 1 ¶ 11.) In addition, Douglas claims that the Defendants retaliated against him, in violation of 42 U.S.C. § 2000e–2(a)(1), by "[t]erminating [his] employment due to the above listed allegations without conducting a fair and thorough investigation," and "[f]ailing or refusing to take appropriate action to remedy the effects of [his] discriminatory treatment." (*See* dkt. # 1 ¶ 12.)

The Defendants have moved for summary judgment. In their motion, the Defendants assert that Douglas' claims must fail because he has not presented any evidence that the Defendants have discriminated against him because of his race; the Defendants took an adverse employment action against him because of his race; or there were circumstances creating an inference of racial discrimination. In addition, the Defendants maintain that Douglas cannot establish the essential elements of his retaliation claims.

### A. SUMMARY JUDGMENT STANDARD

A motion for summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

Summary judgment is appropriate if, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "The burden is on the moving party 'to demonstrate the absence of any material

factual issue genuinely in dispute.'" *Am. Int'l Group v. London Am. Int'l Corp.*, 664 F.2d 348, 351 (2d Cir.1981) (quoting *Heyman v. Commerce & Indus. Ins. Co.*, 524 F.2d 1317, 1319–20 (2d Cir.1975)).

A dispute concerning a material fact is genuine " 'if evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir.1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The Court must view all inferences and ambiguities in a light most favorable to the nonmoving party. *See Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.1991). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Id.*

## B. FIRST COUNT

■ Title VII of the Civil Rights Act of 1964 directs that it is "unlawful for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of the individual's race, color, religion, sex or national origin." 42 U.S.C. § 2000e–2(a)(1). In the First Count of his Complaint, Douglas alleges that the Defendants discriminated against him because of his race in violation of Title VII by harassing and subjecting him to a hostile work environment, transferring him to Technical Services after a dispute between Douglas and a white co-worker, and failing to take appropriate action to remedy the effects of discrimination against Douglas.

In the instant case, Douglas has presented no evidence supporting the claims in the First Count,[6] nor, in his memorandum of law in opposition to the Defendants' summary judgment motion, has he presented any legal arguments regarding these claims. From what the court can discern in the "Factual Background" portion of Douglas' memorandum (which does not, by itself, constitute "evidence"), Douglas only hints that there was a "hostile work environment." Douglas states that he "began to experience problems with Leo Flanagan ... and certain employees beginning on or about September 2003. This consisted of harassment and discrimination against Mr. Douglas." (*See* dkt. # 29.) Douglas then goes on to say, more than once, "the harassment continued"; however, Douglas gives no details as to this harassment, let alone provide the court with evidence demonstrating such harassment.

In addition, Douglas' memorandum does not mention his transfer to Technical Services at all.[7] Moreover, Douglas' memorandum does present any factual basis or arguments demonstrating that the Defendants failed to take appropriate action to remedy the effects of discrimination against Douglas. Furthermore, in the memorandum's analysis section, there is no legal discussion of any of the claims contained in the First Count. It appears that Douglas presents arguments relating to his retaliation claims only, as is evidenced by the main heading under Douglas' "LAW AND ARGUMENT" section, which reads, "THE PLAINTIFF HAS ESTABLISHED A CAUSAL CONNECTION BETWEEN HIS PROTECTED ACTIVITIES AND THE DEFEN-

---

6. Indeed, in addition to not filing a Local Rule 56(a)(2) Statement, Douglas has failed to attach any evidence or affidavits to his memorandum of law.

7. Rather, with regard to transfers, Douglas only mentions those times when he himself requested a transfer, but was denied. (*See* dkt. # 29.)

DANTS' ADVERSE EMPLOYMENT ACTIONS." (*See id.*)

"Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way." *Taylor v. City of New York*, 269 F.Supp.2d 68, 75 (E.D.N.Y.2003); *see Barlow v. Connecticut*, 319 F.Supp.2d 250, 266–67 (D.Conn. 2004); *Bronx Chrysler Plymouth, Inc. v. Chrysler Corp.*, 212 F.Supp.2d 233, 249 (S.D.N.Y.2002) (dismissing one of the plaintiff's claims as "abandoned" where the plaintiff's summary judgment opposition papers "made no argument in support of [that] claim at all"). The Defendants have moved for summary judgment on all of Douglas' claims, including his hostile work environment claim, his claim that his transfer to Technical Services after a dispute with a white co-worker was racially motivated, and his claim that the Defendants failed to take appropriate action to remedy the effects of discrimination against him. (*See* dkt. # 27.) These three claims constitute the entirety of the First Count of Douglas' Complaint. Because Douglas does not address these claims in his memorandum opposing the Defendants' summary judgment motion, the court shall deem them abandoned. Consequently, with regard to the First Count of Douglas' Complaint, the Defendants' motion for summary judgment is **GRANTED**.

## C. SECOND AND THIRD COUNTS

In the Second and Third Counts of Douglas' Complaint, Douglas claims that the Defendants violated 42 U.S.C. § 2000e-(2)(a)(1), 3(a). Specifically, in the Second Count, Douglas alleges that the Defendants wrongfully retaliated against him by:

a. Subjecting [him] to harassment that adversely affected the terms, conditions, and privileges of his employment because he opposed employment practices on the basis of race, because he filed several internal complaints of discrimination and harassment with the Defendant[s], and because he filed a charge of discrimination and harassment with the CHRO and the EECO[;][and]

Alleging that [he] was insubordinate on twelve occasions during a six-week period after he filed charges of discrimination and harassment with the CHRO and the EEOC.

(Dkt. # 1 ¶ 11). In the Third Count, Douglas alleges that "the Defendant[s] ha[ve] retaliated against [him] ... by: a. Terminating [his] employment due to the above[-]listed allegations without conducting a fair and thorough investigation[;][and] b. Failing or refusing to take appropriate action to remedy the effects of the discriminatory treatment...." (*Id.* ¶ 12).

### 1. Third Count: Substantive Discrimination Claims

The court begins by pointing out that, in the Third Count, Douglas states that "the Defendants ha[ve] retaliated against [him] in violation of § 704(a) of Title VII, 42 U.S.C. § 2000e–2(a)(1)...." (*Id.*) Section 704 of Title VII does, in fact, prohibit wrongful retaliation; however, 42 U.S.C. § 2000e-(2)(a)(1) is not the codification of this prohibition against retaliation, but rather the codification of § 703 of Title VII, which prohibits wrongful discrimination. Because it is not clear whether the Third Count addresses Title VII discrimination only (42 U.S.C. § 2000e–2(a)), Title VII retaliation only (42 U.S.C. § 2000e–3(a)), or both, the court shall give Douglas the benefit of the doubt and assume that the Third Count alleges both racial discrimination and retaliation.

Nevertheless, for the same reasons stated above, *see supra* Part III.B, the court

deems abandoned any discrimination claims in the Third Count brought pursuant to 42 U.S.C. § 2000e–2(a). In his opposition memorandum, Douglas does not address or analyze his substantive discrimination claims. Rather, his memorandum is directed solely at retaliation claims: the legal standard he sets forth is for Title VII retaliation; the headings in the memorandum speak of "protected activities" and "causal connections," which are elements of retaliation claims; and Douglas' arguments relate to retaliation only. Consequently, with regard to any Title VII discrimination claims that may be contained in the Third Count, the Defendants' motion for summary judgment is **GRANTED.**

### 2. Second and Third Counts: Retaliation Claims

Title VII prohibits retaliation against employees who exercise rights protected by the statute. *See* 42 U.S.C. § 2000e–3(a). Claims brought pursuant to Title VII, including retaliation claims, are reviewed under the familiar burden-shifting analysis the Supreme Court set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Terry v. Ashcroft,* 336 F.3d 128, 141 (2d Cir.2003) ("The *McDonnell Douglas* burden shifting analysis used in claims of discrimination in violation of Title VII also applies to retaliation claims brought pursuant to Title VII.") First, "[t]he complainant in a Title VII [case] must carry the initial burden under the statute of establishing a *prima facie* case...." *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. "In order to establish a *prima facie* case of retaliation, [a plaintiff] must show that: (1)[ ]he engaged in a protected activity; (2) h[is] employer was aware of this activity; (3) the employer took adverse employment action against h[im]; and (4) a causal connection exists between the alleged adverse action and the

protected activity." *Schiano v. Quality Payroll Sys., Inc.,* 445 F.3d 597, 608 (2d Cir.2006).

Next, if a plaintiff establishes a *prima facie* case, "[t]he burden then must shift to the [defendant] to articulate some legitimate, nondiscriminatory reason for the [adverse employment action]." *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. Finally, if the defendant does articulate a legitimate, nondiscriminatory reason for the adverse employment action, "[t]he plaintiff then has the opportunity to prove 'by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext....'" *Back v. Hastings On Hudson Union Free Sch. Dist.,* 365 F.3d 107, 123 (2d Cir.2004) (quoting *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)); *see McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. 1817.

### a. The Plaintiff's *Prima Facie* Case

The Defendants first assert that Douglas has failed to meet his burden in establishing a *prima facie* retaliation claim. As an initial matter, the Defendants concede that Douglas engaged in protected activity by filing a CHRO complaint. Douglas also claims, however, that "he opposed employment practices on the basis of race" by filing "several internal complaints of discrimination and harassment with the Defendant[s]" and filing a complaint with the EEOC. The filing of internal complaints, or of an EEOC complaint, would constitute activities protected under Title VII. *See Wimmer v. Suffolk County Police Dept.,* 176 F.3d 125, 134 (2d Cir.1999) ("To establish ... participation in a protected activity ... [the plaintiff] need not prove that the conditions against which he protested actually amounted to a violation of Title VII. ... Rather, [the plaintiff] must demonstrate only that he

had a good faith, reasonable belief that the underlying challenged actions of the employer violated the law.") (internal quotation marks and citations omitted). The court thus concludes that Douglas has satisfied the first and second elements of a *prima facie* retaliation case insofar as he filed CHRO, EEOC,[8] and internal complaints, about which the Defendants were aware.

With regard to the third element of a *prima facie* retaliation claim, which requires a showing of "adverse employment action," the Defendants also concede that Douglas' termination constitutes an adverse employment action. The Defendants do not appear to concede, however, that Douglas was "subjected to harassment," nor do they concede that "alleging that [Douglas] was insubordinate on twelve occasions" was an adverse employment action.

The Supreme Court has held that "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. and Santa Fe Ry. Co. v. White*, —— U.S. ——, 126 S.Ct. 2405, 2415, 165 L.Ed.2d 345 (2006) (internal quotation marks omitted). This standard "speak[s] of *material* adversity because ... it is important to separate significant from trivial harms. Title VII ... does not set forth 'a general civility code for the American workplace.'" *Id.* (emphasis in original) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998)).

In the Second Circuit, "[e]mployment actions that have been deemed sufficiently disadvantageous to constitute an adverse employment action include a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices ... unique to a particular situation." *Kessler v. Westchester County Dept. of Soc. Servs.*, 461 F.3d 199, 207 (2d Cir.2006) (internal quotation marks omitted). Nevertheless, as seen in *White*, "the means by which an employer can retaliate against an employee are not limited to altering his compensation, terms, conditions, or privileges of employment...." *Id.* at 208; *see White*, 126 S.Ct. at 2412–13. That is, with regard to adverse employment actions, Title VII retaliation claims have a "more relaxed standard" than substantive anti-discrimination Title VII claims, and are not limited to conduct that affects the terms and conditions of employment, such as hiring, firing, change in benefits, or reassignment. *See Gomez v. Laidlaw Transit, Inc.*, 455 F.Supp.2d 81, 89 (D.Conn.2006); *Perugini v. Stryker Orthopaedics*, No. 305CV1289 MRK, 2007 WL 601454, at *10 (D.Conn. Feb.22, 2007). Again, the plaintiff must show that his employer's actions well might have dissuaded a reasonable worker from making or supporting a charge of discrimination. *See White*, 126 S.Ct. at 2415.

In light of Supreme Court precedent, the court concludes that, in addition to Douglas' termination, the allegations of Douglas' insubordination would constitute

---

**8.** The court points out that Douglas has not submitted a copy of his EEOC complaint. In the "Factual Background" portion of his memorandum of law, Douglas represents that the EEOC complaint was filed on February 23, 2004. Again, the court notes that such a representation does not constitute "evidence." Nevertheless, for the purposes of this motion, the court shall accept as true Douglas' representation he filed an EEOC complaint on February 23, 2004.

adverse employment actions for the purposes of a Title VII retaliation claim. In his affidavit, Bruce stated that he documented and reported to Flanagan instances of insubordination involving Douglas. Such negative allegations from an supervisor, which might affect an employee's work record, conceivably could dissuade that employee from making or supporting a discrimination charge. Therefore, for the purposes of a Title VII retaliation claim, the court concludes that both the allegations of insubordination and Douglas' termination would constitute adverse employment actions.

The court shall not credit, however, Douglas' general allegations of "harassment." Douglas has failed to provide the court with any factual support for any of his allegations. Indeed, the allegations of insubordination, and Douglas' termination, are evidenced only by the materials submitted by the Defendants. For the purposes of summary judgment, Douglas' general claims that he was harassed, without any specifics or evidence, are wholly insufficient to support a *prima facie* case of retaliation.[9] Therefore, the court shall consider only the insubordination allegations and Douglas' termination for the purposes of Douglas' Title VII retaliation claims.

The final *prima facie* element for a Title VII retaliation claim is the "causal connection" element. Of course, the causal connection between a protected activity and an adverse employment action may be established by direct evidence. Douglas has provided no such direct evidence. In addition, however, "[t]he causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed

in time by the adverse action." *Lovejoy–Wilson v. NOCO Motor Fuel, Inc.,* 263 F.3d 208, 224 (2d Cir.2001) (internal quotation marks omitted). The Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." *Gorman–Bakos v. Cornell Co-op Extension of Schenectady County,* 252 F.3d 545, 554 (2d Cir.2001) (collecting cases).

In the Second Circuit and district courts within the Second Circuit, time periods greater than one year have been found, in general, to be insufficient to establish this temporal relationship. *See Deravin v. Kerik,* No. 00 CV 7487(KMW)(KNF), 2007 WL 1029895, at *11 (S.D.N.Y. Apr 02, 2007) (collecting cases). Within the time period of one year, there is no firm rule. In some cases, time periods ranging from twelve days to eight months have been found to show the necessary temporal proximity. *See id.* n. 21 (collecting cases). In other cases, time periods ranging from two-and-a-half months to eight months have been deemed insufficient to show the necessary temporal proximity. *See id.* n. 22 (collecting cases).

For the purposes of this motion, the court shall assume that the necessary temporal proximity has been shown between Douglas' CHRO, EEOC, and internal complaints and the adverse employment actions. Douglas initially filed his CHRO complaint on November 24, 2003, and the alleged adverse employment actions occurred approximately two to five months subsequent to that complaint. The temporal proximity is even closer with regard to

---

**9.** The court shall credit Douglas' "harassment" allegations only insofar as such allegations coincide with the insubordination allegations that the Defendants levied against Douglas.

Douglas' EEOC and internal complaints. For the purpose of establishing the "causal connection" element, the Second Circuit and district courts within the Second Circuit have deemed such time periods sufficient. *See id.* n. 21. Therefore, the court finds that Douglas has established a *prima facie* Title VII retaliation case insofar as he alleges that the Defendants accused him of insubordination and terminated his employment in response to his CHRO, EEOC, and internal complaints against the Defendants.

### b. Legitimate, Nondiscriminatory Reason; Pretext

■ Because the court has determined that Douglas has established a *prima facie* case for some of his claims, the Defendants must articulate some legitimate, nondiscriminatory reason for the adverse employment actions taken against Douglas. The Defendants have done so. The court need not go into great detail here, as the court is satisfied that the Defendants have produced materials sufficiently explaining their reasons. Needless to say, the Defendants have offered ample evidence of Douglas' tardiness and absenteeism. In addition, the Defendants have stated that the reason why there are reports that Douglas was insubordinate is because Douglas was, in fact, insubordinate to his superiors; the Defendants have submitted evidence and affidavits describing this insubordination. Douglas' conduct at work, as alleged by the Defendants, provides the Defendants with a legitimate, nondiscriminatory reason for the adverse employment actions they took against Douglas. Thus, the court finds that the Defendants have met their burden under *McDonnell Douglas.*

■ The burden now shifts back to Douglas to "point to evidence that would be sufficient to permit a rational factfinder to conclude that [his] employer's explanation is merely a pretext for impermissible retaliation." *Treglia v. Town of Manlius,* 313 F.3d 713, 721 (2d Cir.2002). Based on Douglas' tardiness and absenteeism problems at work, and based on Douglas' conduct toward Flanagan, McSweeney, and Bruce, who were Douglas' supervisors, there is ample evidence to support the Defendants' reasons for accusing Douglas of insubordination and terminating him.

As mentioned above, Douglas has submitted no affidavits or evidence at all, let alone affidavits or evidence that would permit a rational factfinder to find that the Defendants' reasons for their actions against Douglas were pretext. In his memorandum of law, Douglas does not specifically make a "pretext" argument (although he does mention "pretext" when setting forth the *McDonnell Douglas* burden-shifting framework), and the court declines to make the argument for him. Moreover, Douglas' "causal connection" arguments are insufficient to demonstrate pretext. *See Diggs v. Town of Manchester,* 303 F.Supp.2d 163, 179 (D.Conn.2004) ("The mere temporal proximity of [the adverse employment actions] to [the protected activities] i[s] not enough, in and of itself and under the circumstances, to support a finding of pretext [for impermissible retaliation].") (citing *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 81 (2d Cir.2001)).

Douglas does argue in his memorandum of law that the Defendants "terminated [him] ... without conducting a fair investigation," "failed to prove [at the hearing before the State Board of Mediation and Arbitration] that [Douglas] was insubordinate to Mr. Bruce," and "failed to prove that [at the hearing before the State Board of Mediation and Arbitration] that [Douglas] was insubordinate to Mr. McSweeney." (*See* dkt. # 29.) Nevertheless, the court fails to see how these arguments support, or even relate to, Douglas' claims

in this case. Douglas did not bring this case alleging violations of his procedural due process rights, nor did he bring this case under the theory that he was denied a fair hearing before the State Board of Mediation and Arbitration, or that the findings of the State Board of Mediation and Arbitration were not supported by the evidence. Rather, Douglas brought this action against the Defendants pursuant to Title VII, to which the above-mentioned arguments are not apropos.

In this action, both sides had the opportunity to submit with their paperwork evidence and affidavits relating to Douglas' Title VII claims. The Defendants did so. Douglas did not. There is no evidence here that the Defendants' reasons for accusing Douglas of insubordination and terminating Douglas were in any way pretext. Therefore, because a rational factfinder could not conclude that the Defendants' explanations for the adverse employment actions taken against Douglas were pretext for impermissible retaliation, the court finds that Douglas has not satisfied his ultimate burden under *McDonnell Douglas*. Consequently, with regard to the retaliation claims in the Second and Third Counts, the Defendants motion for summary judgment is **GRANTED**.

## IV. CONCLUSION

For the foregoing reasons, the Defendants' motion for summary judgment (dkt.# 27) is **GRANTED**. Judgment in favor of the City of Waterbury and the Silas Bronson Library shall enter on all counts of the Complaint. The Clerk of the Court shall close this file.

**SO ORDERED** this *29th* day of June, 2007.