**Robert IDE, Plaintiff,**

v.

**WINWHOLESALE, INC., Defendant.**

No. 3:07CV00556 (DJS).

United States District Court, D. Connecticut.

Jan. 6, 2009.

**250**

David Scott Feldman, Milford, CT, for Plaintiff.

Glenn William Dowd, Howard Fetner, Day Pitney LLP, Hartford, CT, for Defendant.

### MEMORANDUM OF DECISION AND ORDER

DOMINIC J. SQUATRITO, District Judge.

The plaintiff, Robert Ide ("Ide"), brings this action against the defendant, WinWholesale, Inc. ("WinWholesale"), alleging that WinWholesale wrongfully terminated him from his employment. The first count of the complaint alleges that WinWholesale violated the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.* ("ADA"). The second count of the complaint alleges that WinWholesale's termination of Ide's employment was wrongful under Connecticut common law. Now pending before the Court is WinWholesale's motion for summary judgment (dkt. # 21). For the reasons stated hereafter, WinWholesale's motion for summary judgment (**dkt. # 21**) is **GRANTED.**

### I. MOTION TO STRIKE

Before addressing the background facts of this case, the court must first address WinWholesale's motion to strike (dkt. # 31). WinWholesale seeks to strike portions of Ide's Local Rule 56(a)(2) Statement and portions of Ide's affidavit, which were submitted along with the summary judgment opposition papers.

The Federal Rules of Civil Procedure do not explicitly allow motions to strike for such purposes. Rule 12(f) reads that the court may, upon a motion or its own initiative, "order stricken from any pleading any insufficient defense or any redundant,

immaterial, impertinent, or scandalous matter." Fed.R.Civ.P. 12(f). Neither affidavits nor Local Rule 56(a) Statements qualify as "pleadings" under the Federal Rules. *See* Fed.R.Civ.P. 7(a). Neither does Rule 56, which governs summary judgment, provide a "motion to strike" as a tool in the summary judgment process. *See* Fed.R.Civ.P. 56.

Indeed, the undersigned has recently expressed his disapproval of filing motions to strike during the summary judgment process, noting that "in the context of summary judgment, motions to strike are unnecessary and produce only redundant statements by the court that it has not relied on such inadmissible evidence in deciding the summary judgment motion." *Martin v. Town of Westport*, 558 F.Supp.2d 228, 231 (D.Conn.2008) (internal quotation marks omitted). The parties to an action "should have faith ... that the court knows the difference between admissible and non-admissible evidence, and would not base a summary judgment decision simply upon the self-serving *ipse dixit* of a particular party." *Id.* "If a party wishes to argue that an asserted material fact is not supported by the evidence, that party may do so in its summary judgment briefing." *Id.* (internal quotation marks omitted). Here, as in *Martin*, the court sees no need to "strike" any portions of the Ide's submissions which may not be admissible because "Local Rule 56(a) requires a court to consider only those statements of fact that are supported by the evidence." *Id.* Consequently, WinWholesale's motion to strike (**dkt. # 31**) is **DENIED**.

## II.  FACTS

Ide worked for WinWholesale (or its predecessor companies) at WinWholesale's office in North Haven, Connecticut from 1975 until 2006. At no point did Ide have an employment contract with WinWholesale. In 2004, Ide was named Regional Finance Director, a position which entailed running an office with five employees, performing internal audits on sixty-four local wholesale companies, providing regional accounting for those companies, assisting outside auditors at the end of the fiscal year, and helping local companies solve their problems and ensure their profitability. Prior to 2004, Ide's job title had been different, but his job responsibilities and duties were generally the same.

In 2003, Wayne Batter ("Batter"), who worked for WinWholesale as an Area Leader, began working with Ide in the North Haven office. An Area Leader's job is to provide operational support to local Win Companies with an overall objective of increasing earnings, gross margin, and total sales. Ide and Batter had known each other since Batter, with whom Ide found it difficult to get along, began to work for WinWholesale in the early 1980s. With the exception of business functions, Ide did not socialize with Batter and they did not see one another outside of work more than once or twice a year. Nevertheless, Ide thought it would be better for his and Batter's relationship, and for the local companies, if he and Batter worked together in the same office. According to Ide, if he and Batter were located in different offices, it would seem that they were not coordinated to help the local companies.

It would be an understatement to say that, through working together in the same office, Ide and Batter came to regard each other as ugsome. Ide claims that Batter is an atrabilious individual who regularly degraded Ide and his staff from the time he began working in the North Haven office. According to Ide, Batter would demean Ide by saying that Ide did not work, kept unacceptable hours, took too

much time off, and frequently came in late and left early. Additionally, Batter would state that the work Ide and his subordinates did was insignificant.

Ide took offense to Batter's assertions and frequently responded to these comments by making his own assertions against Batter in letters and emails to the company's senior management. Additionally, both Batter and Ide frequently brabbled with each other via email, making derogatory comments, accusations, and other seemingly unprofessional remarks. These emails were often copied to Ide's and Batter's superiors, and to one of Ide's subordinates, Dan Skelly ("Skelly").

In the fall of 2005, Ide and Batter got into a loud argument in the office. After the argument, Batter left the office, claiming that he could not work with Ide, and that he would work from home until WinWholesale worked out another arrangement. Ide responded with an email, dated September 26, 2005, wherein he told to Batter "[l]et me know when are entirely out of here so we can start the celebration[,]" and "if you ever want to meet me outside to discuss all the slander you've thrown at me please let me know." (Dkt. # 21, Ex. 13.) Batter considered this email to be comminatory, interpreting it as a threat of physical violence. Batter subsequently sent an email to his superiors reporting the incident and insisting that it be resolved or he would be forced to resign. Despite all of this, however, Batter returned to the North Haven office about a week after he left.

On October 6, 2005, WinWholesale had their Dayton, Ohio attorney, Robert Portune of Gottschlich & Portune, LLP ("Portune") and WinWholesale's Dayton Human Resources Director, Tom Snow ("Snow"), meet with and interview Ide. During the course of the interview, the ongoing and escalating conflicts between Batter and Ide were carefully examined in detail. Ide acknowledged in the interview that he had violated WinWholesale's Electronic Workplace Policy, which requires employees, "to avoid making statements in e-mail . . . that would not reflect favorably on an employee, an ex-employee or the Company." (dkt. # 21, Ex. 16.) The policy states that violations, "may result in disciplinary action, up to and including discharge." (*Id.*)

In October 2005, both Ide and Batter were issued Corrective Action memoranda. Ide's memorandum listed several steps he was required to take in order to improve his conduct at work, including maintaining his composure and treating everyone, including Batter, with "dignity and respect" (Dkt. # 21, Ex. 16.) He was also required to adhere completely to the Electronic Workplace Policy and to cease copying his subordinates on emails concerning Wayne Batter and any other management issues. Ide was also instructed to put together a list of specific ways for him to work on and meet the memorandum's requirements; he was to submit this list to his supervisor, Jack Johnston ("Johnston"), within a month after the memorandum was issued. Furthermore, he was to meet with Johnston after six months to discuss and evaluate his progress. The memorandum specifically stated that failure to follow its requirements would result in further corrective or disciplinary action, up to and including termination.

Ide never submitted a list to Johnston pursuant to the Corrective Action memorandum. Additionally, about one month after receiving and signing the corrective memo, Ide sent to Richard Schwartz ("Schwartz"), the company's CEO, a four-page letter complaining about Batter. After that, there were no problems until the spring of 2006 when, according to Ide, Batter made up two stories about Donna Clarke ("Clarke"), the North Haven of-

fice's credit coordinator. On April 17, 2006, Ide reported these accusations against Clarke to Schwartz via email, calling Batter a "liar" and "unprofessional," and suggested that Batter cares more about a personal vendetta than he does about his responsibilities.

In May, 2006, Ide removed Batter's individual office from the North Haven office's alarm system, and he barred Batter from entering or exiting through the building's front door. On May 8, 2006, Ide emailed Johnston, listing three reasons for removing Batter from the building's alarm system. Ide has admitted in his deposition testimony, however, that none of the reasons he gave Johnston were true; instead, he was hoping to anger Batter enough to get him to leave the office (Dkt. # 22, Ex. 2, Ide Depo. at 217, 219–22). After this event, both Ide and Batter once more began to submit emails to their superiors complaining about one another and about the office's environment.

On June 6, 2006, Clarke sent an email to Ide, which she also forwarded to Johnston and copied to Skelly, in which she complained about Batter's behavior towards her and the other employees at the North Haven office. On July 7, 2006, Clarke sent an email to Ide, wherein she resigned as credit coordinator because she was "unable to work with" Batter. In this email, she alleged that Batter had "made remarks about my personal appearance, my personal life issues, and out right lied about things I did not do or say." (Dkt. # 21, Ex. 25.) Ide forwarded Clarke's email to Schwartz, Johnston, Skelly, and stated that Clarke would no longer serve as credit coordinator but would continue to be employed in the North Haven office in some other capacity. Ide's email was forwarded to Batter, who responded on July 9, 2006 with another email to the upper management complaining about Ide's behavior, calling him immature and making further accusations of inappropriate behavior.

On July 11, 2006, Rhonda Binger ("Binger"), WinWholesale's Vice President of Human Resources, and Portune met with Ide, told him that he was being terminated, and presented him with a memorandum from Johnston stating that this termination was due to the unresolved conflict between him and Batter. At this meeting, Ide neither protested nor questioned the reason for his termination. Batter was also terminated on July 11, 2006.

Ide filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission (the "EEOC") in Cincinnati, Ohio. The EEOC file is stamped February 23, 2007. Ide did not file a charge of discrimination with any state agency and he did not ask the EEOC to forward his charge to any state agency.

In the complaint (dkt. # 1 ¶¶ 22–24), Ide alleges that during the company's March 2006 annual meeting in Phoenix, Arizona, Schwartz spoke to him about Batter, telling him that he wanted Ide to find a reason to fire Batter. Ide maintains that Schwartz told him that Batter had medical problems,[1] which were costing the company's insurance $300,000 a year, and that he was afraid that if Schwartz fired him, Batter would sue WinWholesale. (Dkt. # 22, Ex. 2, Ide Depo. at 58–61.) Ide states that his violations of the October 2005 memo-

---

1. According to Ide, Batter had complained about his physical condition during the time he was employed with WinWholesale, but was not substantially limited in caring for himself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning or working. Ide maintains that Batter had hemophilia, but he is unsure if WinWholesale's management was aware of Batter's condition. (Dkt. # 22, Ex. 2, Ide Depo. at 256)

randum were the result of this conversation.

## III. DISCUSSION

Ide alleges that the termination of his employment violated the ADA, and is invalid due to the alleged coercion by WinWholesale to obtain Ide's signature on the October 2005 Corrective Action memorandum. WinWholesale has moved for summary judgment on both claims. The Court shall discuss the parties' arguments seriatim.

### A. SUMMARY JUDGMENT STANDARD

A motion for summary judgment may be granted, "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56.

Summary judgment is appropriate if, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "The burden is on the moving party 'to demonstrate the absence of any material factual issue genuinely in dispute.'" *Am. Int'l Group, Inc. v. London Am. Int'l Corp.*, 664 F.2d 348, 351 (2d Cir.1981) (quoting *Heyman v. Commerce & Indus. Ins. Co.*, 524 F.2d 1317, 1319–20 (2d Cir. 1975)).

A dispute concerning a material fact is genuine "if evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir.1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The court must view all inferences and ambiguities in a light most favorable to the nonmoving party. *See Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.1991). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Id.*

### B. ADA

■ In the first count of the complaint, Ide alleges that WinWholesale violated the ADA when it terminated his employment. According to Ide, WinWholesale terminated his employment to cover up for the fact that the termination of Batter was based upon Batter's supposed disability.[2] The Court does not see how such a claim is sustainable. Ide does not claim that he himself was disabled. Indeed, Ide does not even claim that he was terminated for supporting Batter's rights under the ADA.

The Court, however, need not address in detail Ide's ADA claim because, by all appearances, he has (wisely) abandoned this claim. WinWholesale moved for summary judgment on this claim, and in its memorandum of law, provided substantial arguments for why Ide's ADA claim fails. Ide, in his opposition memorandum, does not discuss his ADA claim at all. "'Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way.'" *Ludwiczak v. Hitachi Capital Am. Corp.*, 528 F.Supp.2d 48, 59 (D.Conn.2007) (quoting *Douglas v. City of Waterbury*, 494 F.Supp.2d 112, 122

---

**2.** The Court points out that Ide has submitted no admissible evidence demonstrating that

Batter is or was, in fact, disabled.

(D.Conn.2007)). Because Ide did not address his ADA claim when opposing summary judgment, the court shall deem this claim abandoned. As such, with regard to Ide's ADA claim, WinWholesale's motion for summary judgment (**dkt. #21**) is **GRANTED**.

## C. WRONGFUL TERMINATION

■ In the second count of his complaint, Ide alleges a claim of wrongful termination under Connecticut common law, claiming that his termination contravened public policy. According to Ide, he was "coerced" (i.e., threatened with termination) into signing the Corrective Action memorandum, and this coercion "voided" the "agreement," which was the basis for his termination.

■ "In Connecticut, an employer and employee have an at-will employment relationship in the absence of a contract to the contrary." *Thibodeau v. Design Group One Architects, LLC,* 260 Conn. 691, 697, 802 A.2d 731 (2002) (internal quotation marks omitted). "Employment at will grants both parties the right to terminate the relationship for any reason, or no reason, at any time without fear of legal liability." *Id.* at 697–98, 802 A.2d 731 (internal quotation marks omitted). There is no dispute that Ide was an at-will employee.

■ There are, however, certain exceptions to the at-will employment policy. Thus, a plaintiff can bring an action alleging wrongful termination "if the former employee can prove a demonstrably improper reason for dismissal, a reason whose impropriety is derived from some important violation of public policy."

*Sheets v. Teddy's Frosted Foods, Inc.,* 179 Conn. 471, 475, 427 A.2d 385 (1980). When a plaintiff alleges such a claim, courts must "look to see whether the plaintiff has ... alleged that his discharge violated any explicit statutory or constitutional provision ... or whether he alleged that his dismissal contravened any judicially conceived notion of public policy ...." *Thibodeau,* 260 Conn. at 699, 802 A.2d 731 (internal quotation marks omitted).[3] Courts should, however, "adhere[ ] to the principle that the public policy exception to the general rule allowing unfettered termination of an at-will employment relationship is a narrow one...." *Parsons v. United Techs. Corp., Sikorsky Aircraft Div.,* 243 Conn. 66, 79, 700 A.2d 655 (1997).

Ide's claim fails as a matter of law because he has not demonstrated any statutory, constitutionally, or judicially recognized public policy that WinWholesale's actions contravened. Ide claims that he was coerced into signing the Corrective Action memorandum, which, for the sake of this discussion, the Court shall accept as true. This act, though, does not necessarily violate public policy. As noted above, Ide was an at-will employee. WinWholesale could terminate Ide's employment at any time for any reason, even a foolish or wicked reason, so long as the reason is not contrary to law. The Court would consider the coercion alleged here to be against public policy only if the Corrective Action memorandum demanded illegal conduct from Ide or curtailed Ide's rights.

The parties know, however, that the Corrective Action memorandum was not so

---

3. The Court points out that such wrongful discharge actions are disallowed when plaintiffs have an available statutory remedy. *See Burnham v. Karl & Gelb, P.C.,* 252 Conn. 153, 162, 745 A.2d 178 (2000). Ide has alleged that his termination violated the ADA, pursuant to which he sought a statutory remedy. Nevertheless, because the Court has found that Ide abandoned his ADA claim, the Court, in the interest of fairness, shall discuss the merits of his common-law wrongful discharge claim.

malevolent in purpose. Ide and Batter were not best of friends. Their mutual animosity permeated the workplace. Although Ide places all the blame on Batter, this case does not require the Court to adjudicate the merits of a "But he started it!" defense. Regardless of who did what to whom first, it is clear that there was unprofessional conduct from both men. To rectify this situation, WinWholesale issued Corrective Action memoranda to Ide and Batter, essentially demanding that they cease all hostilities and act professionally while at work. WinWholesale also reminded Ide and Batter of WinWholesale's workplace policies, including the Electronic Workplace Policy that the two had continually violated. WinWholesale then required Ide and Batter to sign the memoranda.

WinWholesale's actions did not violate public policy. Instead of exercising its prerogative to fire two employees who had a disruptive working relationship, WinWholesale gave both Ide and Batter a second chance. That second chance was contingent upon their signing the Corrective Action memoranda. The memoranda required Ide and Batter to treat each other in the manner with which they always should have treated each other, i.e., with respect. WinWholesale did not did not violate public policy by requiring Ide to sign his memorandum, nor would have WinWholesale violated public policy by terminating Ide's at-will employment for not signing the memorandum.[4]

Ide argues that "a genuine issue of fact remains to be determined in this case, i.e.,

was the plaintiff terminated for violating the Corrective Action Memo or other reasons." (Dkt. #30.) At the summary judgment stage, however, an "issue of fact," must be material. Accepting as true Ide's assertion that the basis for his termination was the Corrective Action memorandum, the Court is forced to ask, "So what?" WinWholesale maintains that Ide was terminated because of his unprofessional and inappropriate conduct toward, and his inability to work with, Batter. Ide maintains that he was terminated for violating the Corrective Action memorandum. The memorandum, however, required Ide to conduct himself in a professional manner at work, specifically when dealing with Batter. Not only could WinWholesale have terminated Ide under either scenario, but also the "issues of fact" created by Ide's assertion and WinWholesale's assertion are irrelevant. The Corrective Action memorandum prohibited the very actions that WinWholesale claims were the reason for the termination. Thus, in essence, the basis for Ide's termination is the same under either scenario: inappropriate and unprofessional conduct at work.

Ide further argues that the Corrective Action memorandum constituted a contract, but, because he was coerced into signing the Corrective Action memorandum, the contract was void. The merit of this argument escapes the Court. There is no indication that the parties expected or intended the Corrective Action memorandum to be a "contract," nor has Ide established in any way that the Corrective Action memorandum satisfies the legal

---

**4.** Ide has alleged that WinWholesale's coercion included a threat of terminating employees other than Ide if Ide did not sign. Assuming WinWholesale made such a threat (the existence of which is not shown through the Corrective Action memoranda, but only by Ide's self-serving deposition testimony), and assuming Ide believed that WinWholesale

would make good on such a threat, Ide has presented no evidence or argument demonstrating how or why WinWholesale would be precluded from taking such action. Again, at-will employment grants both parties the right to terminate the relationship for any reason, or no reason, at any time without fear of legal liability.

standard for a contract (i.e., offer, acceptance, consideration).

▮ Furthermore, assuming for the sake of argument that Ide signed the Corrective Action memorandum freely, and not under duress as he claims, the Corrective Action memorandum would not constitute a contract. "To constitute sufficient consideration for a promise, an act or promise not only must be a detriment to the promisee but must be bargained for and given in exchange for the promise." *Fisher v. Jackson,* 142 Conn. 734, 737, 118 A.2d 316 (1955). There was no bargained-for exchange, there was no mutual promise. Ide's "promise," as it were, was to act professionally at work; however, this is not sufficient consideration for a contract, because he was promising to do something he was already obligated to do. WinWholesale did not promise anything to Ide. The at-will employment relationship between Ide and WinWholesale remained the same, and WinWholesale could still terminate Ide for any reason at any time.

Ide then argues that the contract was void because he was coerced into signing it. Again, the Court fails to see how this argument helps Ide. Even if the Court were to assume that the Corrective Action memorandum constituted a contract (which it did not), the fact that it was void because of Ide's forced participation is of no consequence. WinWholesale was free to terminate Ide's employment at any time for any reason so long as the termination did not violate public policy. It does not violate public policy to terminate the employment of an employee who continually acts unprofessionally at work.

In truth, the Corrective Action memorandum was not a contract, and it does not appear that WinWholesale intended it to be one. Instead, it was a disciplinary tool used by WinWholesale to put Ide on notice that his behavior at work was unacceptable, and to warn him that future unacceptable conduct would not be tolerated. WinWholesale had Ide sign the memorandum to demonstrate his awareness of it. Because Ide was an at-will employee, WinWholesale was free to terminate Ide's employment if he did not accept this discipline. Ide accepted this discipline. Nevertheless, his unacceptable conduct continued, and WinWholesale terminated his employment. The Court cannot fathom how WinWholesale's actions in this matter violated public policy.[5] With regard to the wrongful discharge claim, WinWholesale's motion for summary judgment (**dkt. # 21**) is **GRANTED.**

## IV. CONCLUSION

For the foregoing reasons, WinWholesale's motion to strike (**dkt. # 31**) is **DENIED,** and its motion summary judgment (**dkt. # 21**) is **GRANTED. Judgment in favor of the defendant, WinWholesale, Inc., shall enter on all counts of the complaint. The clerk shall close this file.**

**5.** In the Court's view, to hold otherwise would establish a precedent that potentially interferes with an employer's obligations by negating the benefits of issuing disciplinary measures to unruly employees. Ide would have it so that every time an employer re- quires an employee to sign a disciplinary memorandum necessitated by that employee's own behavior, the employee can then sue the employer, claiming that the employer coerced him into a contract. The Court declines to adopt such a notion.